Thomas P. DOWD and Becky Dowd, Plaintiffs-
Appellants-Petitioners,

v.

CITY OF NEW RICHMOND, David Levi, Chris
Douglas Lundell, Michael Frederick, Bonnie
McDermott, John Carlstrom and Judith
Carlstrom, Defendants-Respondents,

B.P., Defendant.

Supreme Court

*Nos. 84–1538, 85–0140. Argued February 6, 1987.—Decided
May 11, 1987.*

(Also reported in 405 N.W.2d 66.)

For the plaintiffs-appellants-petitioners there were briefs by *Daniel W. Hildebrand, Steven J. Kirschner, Ross and Stevens, S.C.,* Madison, and *Warren W. Wood,* New Richmond and oral argument by *Daniel W. Hildebrand.*

For the defendants-respondents (Chris Douglas Lundell), there was a brief by *Joe Thrasher* and *Weisel, Thrasher, Doyle & Pelish, Ltd.,* Rice Lake.

For the defendants-respondents (City of New Richmond), there was a brief by *L. R. Reinstra, Scott R. Needham* and *Reinstra, Van Dyk and Needham, S.C.,* New Richmond and oral argument by *Scott R. Needham.*

For the defendants-respondents (David Levi, Michael Frederick and Bonnie McDermott), there was a brief by *Thomas D. Bell, Lila M. Hambleton* and *Doar, Drill and Skow, S.C.,* New Richmond and oral argument by *Lila M. Hambleton.*

LOUIS J. CECI, J. This is a review of an unpublished decision of the court of appeals dated January 21, 1986, affirming a judgment and order of the circuit court for St. Croix county, Thomas H. Barland, presiding circuit judge. The judgment and order of the trial court were consolidated for purposes of appeal. Petitioners Thomas and Becky Dowd seek

review of (1) a decision of the court of appeals which affirmed the trial court's summary judgment dismissal of their complaint as to each of the respondents (Case No. 84–1538) and (2) a decision of the appeals court which affirmed the trial court's order awarding attorney's fees to the city of New Richmond under 42 U.S.C. sec. 1988 (Case No. 85–0140). We affirm the appeals court decision with respect to both the trial court judgment and order.

The facts of this case are both lengthy and complicated. The chronology of events which led to the institution of this lawsuit began in May, 1982, when John and Judith Carlstrom asked city of New Richmond police officer Chris Lundell to arrange for them to meet with Eric Lundell, Chris's brother. At that time, Eric was a district attorney for St. Croix county. The Carlstroms met with Eric and informed him of their suspicions that city of New Richmond police officer Thomas Dowd, petitioner here, had engaged in sexual relations with B.P., their foster child.[1] Thereafter, the Carlstroms brought their complaint to the New Richmond chief of police, David Levi, and Levi assigned officer Michael Johnson to conduct a preliminary investigation of the accusations.

Johnson took statements from the Carlstroms, which are contained in his initial report detailing the investigation. At the time Johnson took the statements, Judith Carlstrom told him that three weeks

[1]John Carlstrom was a former city of New Richmond police officer and had previously been convicted of a sexual offense involving B.P. The memorandum decision of the trial court refers to the Carlstroms as B.P.'s foster parents. However, the Carlstroms, in their statements, identified themselves as B.P.'s mother and stepfather.

before, B.P. told her that she had been sexually involved with Dowd during the summer of 1981. The Carlstroms told Johnson that they were certain that sexual encounters between B.P. and Dowd took place on two separate occasions.

After taking their statements, Johnson advised the Carlstroms to go to the district attorney with their accusations and that the district attorney would decide whether Johnson should proceed with the investigation. Shortly thereafter, Eric Lundell contacted Johnson and authorized him to proceed.

Levi and Johnson agreed that the best method of conducting the investigation was to involve B.P. in the city's "ride-along" program, whereby a juvenile and a friend accompany a police officer in the police squad car during the officer's work shift. Johnson was apparently selected to conduct the investigation because he was personally acquainted with B.P. and had previously worked with juveniles.

At Johnson's request, B.P. agreed to participate in the ride-along program, and on June 15, 1982, she did so. At the conclusion of the program on that day, B.P. gave an oral statement to Johnson regarding her sexual involvement with Dowd. B.P. and Johnson had further discussions for the four days following, until B.P. agreed to make a formal statement to Levi. In a handwritten statement made June 21, 1982, B.P. accused Dowd of having sexual contact with her. In her statement, she related four instances in which a sexual encounter occurred. At that point Max Ihrke, undersheriff for St. Croix county, was brought in to assist in the investigation. Levi had requested Ihrke's help because the investigation had become formal and involved a city police officer. Ihrke obtained statements from seven individuals, including the Carl-

stroms, who reportedly were previously told by B.P. of the encounters with Dowd.

Meanwhile, Johnson completed his duties by filing a report with Levi outlining his investigation of the Carlstroms' charges. With Levi's agreement, Johnson prepared a second version of the report which deleted references to how Johnson became involved in the investigation, his initial meeting with the Carlstroms, and the statements they provided to him. Levi later stated that the revised version of the report was prepared so that B.P. could not find out that her participation in the ride-along program was staged in order to obtain a statement from her. The special prosecutor in this case, Robert Rasmussen, obtained only the edited version of Johnson's investigative report. However, he was told by Levi that the report he received was the modified version, and he was informed of the reasons for the modification. He did not know to what extent the original report was modified, and he did not see the original report until sometime after the trial in this case was held.

Deputy Ihrke's participation as chief investigator in the Dowd matter extended to July 14, 1982, when he arranged for B.P. to take a polygraph examination. At the time he arranged for the polygraph test, Ihrke apparently did not believe that B.P. was credible. After arranging for her to take the test, Irhke received no further assignments with regard to the Dowd investigation.

Special Prosecutor Rasmussen separately interviewed B.P. and concluded that she was truthful. He also requested, however, that she take a polygraph test. Such a test was administered on July 15, 1982. Steven J. Kassing, who administered the examination, concluded that B.P. was truthful.

Based upon the results of the polygraph test, combined with the statements provided by B.P. and various other parties, Rasmussen concluded that there was probable cause to charge Dowd. On August 3, 1982, Rasmussen issued a summons and criminal complaint against Dowd. The complaint charged him with two counts of sexual contact with an unconsenting minor, two counts of adultery, and one count of enticing a minor with intent to commit a crime against sexual morality. The complaint arose from two incidents of sexual misconduct which allegedly occurred, one in mid-June, 1981, and another in mid-August, 1981.

On October 27, 1982, Dowd filed a notice of alibi, averring that he was not in New Richmond between June 3 and June 17, 1981. One of the incidents reportedly occurred during this time period.

Trial was scheduled to begin on November 10, 1982, and the prosecution had until November 5, 1982, to file its list of alibi rebuttal witnesses with the court. Rasmussen instructed Levi to compile a list of those witnesses for him.

On November 5, 1982, Levi called a meeting in his office at the New Richmond police department. Chris Lundell and Michael Frederick, another city of New Richmond police officer, were present. Levi asked Lundell and Frederick to try to recall whether they had seen Dowd in New Richmond during the time period covered by his alibi. This meeting was informal and not "secret"; the door to Levi's office was left open, and police department employees were milling in and out of the office during the course of the meeting. Bonnie McDermott, a police department secretary, was also asked whether she had any knowledge of Dowd's whereabouts during the alibi period.

She stated that she recalled seeing Dowd at the police station on either June 16 or 17. Lundell recalled that he had taken a hacksaw to Dowd's home sometime during the time period at issue, but he was unable to remember exactly when that incident occurred. Dowd had reportedly phoned the Lundell home to ask for a hacksaw for a remodeling project he was working on. Lundell was unable to recall when the phone call was placed.

The adultery charges were dropped prior to trial. Trial proceeded as scheduled on the three remaining charges: two of sexual contact with an unconsenting minor for the incidents allegedly occurring in mid-June, 1981, and mid-August, 1981, and one of enticing a minor with the intent to commit a crime against sexual morality in mid-August, 1981. The state relied on the testimony of four witnesses: B.P., B.P.'s brother Michael, and John and Judith Carlstrom. Dowd moved to dismiss each of the charges after the state had rested its case-in-chief on November 11, 1982. The trial court dismissed the two sexual contact charges on the grounds that a reasonable jury would likely find that the sexual contact was consensual. Trial continued on the third charge (enticement with intent to commit a crime against sexual morality).

At the close of trial proceedings on November 11, 1982, Rasmussen told Levi that he wished to meet with the rebuttal witnesses the next morning, prior to continuation of trial. The meeting with the rebuttal witnesses was held on November 12. At the time, Rasmussen learned that Renee Lundell, Chris Lundell's wife, had spoken with Dowd in mid-June, 1981, regarding his request to use the Lundells' hacksaw. Renee Lundell apparently was able to place the date of that request at June 13, 1981. Rasmussen was also

told that Renee Lundell was at the courthouse to watch the trial. She and her husband had ridden to the courthouse in separate cars. The trial court concluded that they did so because Chris Lundell apparently felt it unwise for them to arrive at the courthouse together.

Rasmussen met with Renee Lundell for the first time on that day, during the noon recess. That afternoon she testified on the state's behalf, over the objection of the defense. Renee Lundell was not on the state's list of possible rebuttal witnesses. On cross-examination, several inconsistencies were revealed regarding certain discussions held between Chris and Renee Lundell and between Chris Lundell and Levi. These inconsistencies pertained to when the Lundells discussed their mutual recollection of the hacksaw incident and when Renee Lundell first learned that she might be a witness in Thomas Dowd's trial.

Chris Lundell testified that he first discussed the hacksaw incident with his wife on the evening of November 5, 1982, after Levi had called the informal meeting in his office at the New Richmond police department to discuss possible rebuttals to Dowd's alibi. Lundell testified that he first told his wife that evening (November 5) that she might be a rebuttal witness. Renee Lundell, on the other hand, testified that she and her husband did not discuss the hacksaw incident until November 11, 1982 (during the trial). She also stated at trial that she first learned she might be a witness on the evening before she testified.

Other inconsistencies were revealed during the cross-examination of Chris Lundell and Levi. Levi testified that he first learned of Renee Lundell's knowledge of the hacksaw incident on November 11, 1982. Chris Lundell, however, testified that he told

Levi of his wife's knowledge of the hacksaw incident on the evening of November 5, 1982.

Three other inconsistencies were revealed at trial:

(1) Chris Lundell testified that he told his wife, on the day after the Carlstroms initially met with his brother Eric to discuss the accusations against Dowd, about the subject matter of that meeting, which had occurred at the Lundells' home. At trial, Renee Lundell stated that she was never told by her husband of the purpose of the visit, but later, during cross-examination, said she could not remember either way.

(2) Chris Lundell and Levi differed as to whether Levi asked Lundell to prepare a report for him regarding his recollection of the hacksaw incident.

(3) Lundell and police officer Michael Frederick differed as to whether Frederick, on the morning of November 12, had mentioned to Rasmussen that Renee Lundell was aware of the hacksaw incident.[2]

Finally, on the last day of trial, November 12, before Renee Lundell was put on the stand, she reportedly said, "Nobody is supposed to see me." Following this statement, John Carlstrom, who was standing nearby, was reported to say, "She's the secret witness that's going to nail that f——— Dowd."

After these inconsistencies in the testimony of the Lundells and Levi became apparent, Judge Kelsey held an *in camera* hearing to clarify them. At the *in camera* hearing, Judge Kelsey advised Levi and the Lundells of the applicable Wisconsin statute dealing

---

[2]Chris Lundell testified that on November 12, 1982, officer Frederick was heard to say, "Chris, tell him about Renee." At trial, Frederick denied ever making any such statement. Rasmussen, in a post-trial deposition, corroborated Lundell's testimony regarding Frederick's statement.

with perjured testimony, sec. 946.31, Stats., and advised them of their rights under *Miranda v. Arizona,* 384 U.S. 436 (1966). After being advised by the trial judge of the perjury statute, Renee Lundell acknowledged that she and her husband discussed the hacksaw incident several times, perhaps including November 5, 1982. She also conceded that her husband may have told her as early as the evening of November 5 that she might be a witness. At the conclusion of the *in camera* hearing, the court denied the defendant's motion to strike the testimony of Renee Lundell, but granted the special prosecutor's motion to dismiss the remaining criminal charge.

After the remaining charge was dropped, Thomas and Becky Dowd commenced this lawsuit. Their complaint, filed July 26, 1983, named the city of New Richmond, David Levi, Chris and Renee Lundell, Michael Frederick, Bonnie McDermott, John and Judith Carlstrom, and B.P. as defendants.

The first claim of plaintiff Dowd's complaint alleged that each of the individual defendants conspired to violate his civil rights by (1) falsely accusing him of sexual misconduct with B.P.; (2) causing him, without probable cause, to be brought before the New Richmond police and fire commission under disciplinary charges; (3) causing him to be charged for sexual misconduct with B.P., all without probable cause; and (4) manufacturing false evidence and suborning and committing perjury at his trial. With respect to the city of New Richmond, Dowd alleged that it negligently: (1) failed to adequately train and supervise its officers and other employees and (2) failed to discover that the charges brought against him were false. The complaint alleged that each of the defendants except the Carlstroms, B.P., and Renee Lundell, acted under

color of state law, in violation of Dowd's right to due process of law under both the Wisconsin and United States Constitutions and under 42 U.S.C. sec. 1983.

In addition to the constitutional claim, Dowd alleged that defendants conspired to willfully or maliciously injure him in his reputation, trade, business and profession, in violation of sec. 134.01, Stats. Also advanced were claims of malicious prosecution and defamation. As a result of defendants' conduct, Dowd allegedly sustained damages totaling $434,853.98, consisting of the costs of his defense in both the disciplinary proceedings and the criminal trial, loss of reputation in the community, pain, suffering, emotional harm, mental anguish, loss of society and companionship with his wife, and injury to his relationship with his family and employer.

Finally, plaintiff Becky Dowd, in the original complaint, alleged that as a result of defendants' conduct, she sustained damages in the amount of $50,000 for pain, suffering, emotional harm and mental anguish, and loss of society and companionship with her husband.

Each of the defendants filed answers with the court, denying liability.

Plaintiffs filed a notice of motion to amend their complaint on April 13, 1984. They moved to amend their complaint to allege that the city of New Richmond "pursued an official policy of (a) allowing defendant Levi the authority to train and supervise the police officers and (b) negligently failing to train and supervise defendant Levi and other police officers." The trial court order granting the Dowds' motion to amend their complaint was filed on May 4, 1984.

Subsequently, each of the defendants (except the Carlstroms and B.P.) filed motions for summary judgment. In a memorandum decision of the circuit court for St. Croix county, dated July 11, 1984, Judge Thomas H. Barland granted each of the defendants' motions for summary judgment. Judgment was entered on July 20, 1984. A notice of appeal was filed on July 26, 1984.

Defendants Renee and Chris Lundell, Levi, Frederick, McDermott, and the city of New Richmond subsequently moved the court for entry of an order awarding attorney's fees pursuant to 42 U.S.C. sec. 1988. Judge Barland's memorandum decision and order, dated November 12, 1984, granted the city's motion for an award of attorney's fees, but denied all other motions. Judgment was entered on November 27, 1984. Plaintiffs filed a notice of appeal of that judgment on January 7, 1985. The cases were consolidated for purposes of appeal on January 21, 1985, and the appeals court affirmed the judgment and order of the trial court on January 21, 1986. Thereafter, the Dowds filed a petition for review with this court, which was granted on April 15, 1986. We address each of these cases in turn.

I.

In reviewing the grant or denial of a motion for summary judgment, the reviewing court is bound to apply the statutory standards, as set forth in sec. 802.08(2), Stats., in the same manner as the trial court is required to apply those standards. Under sec. 802.08(2), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Dowd contends that the respondents engaged in certain conduct which operated to deny him of his civil rights, in violation of 42 U.S.C. sec. 1983, which provides that,

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...."

We first address the potential liability of the city of New Richmond. A municipality may not be held liable under sec. 1983 unless two elements are established. First, the plaintiff must have suffered the deprivation of a right or interest protected either by the United States Constitution or by federal statute. "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Baker v. McCollan,* 443 U.S. 137, 146 (1979). Thus, it has been said that sec. 1983 provides no redress for plaintiffs wishing to sue a municipality based merely upon a theory of *respondeat superior.* In order to be held liable under sec. 1983, the responsible public official or the municipality must have actually caused one of its employees to subject another to the deprivation of

constitutionally or statutorily protected rights. *Id.* at 142; *Monell v. Dep't of Social Services of the City of New York,* 436 U.S. 658, 691–92 (1978).

Second, it must be established that the deprivation occurred as a result of a municipal policy. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under sec. 1983." *Monell,* 436 U.S. at 694.

The question of whether a mere failure to supervise and/or train can rise to the level of a sec. 1983 violation has been the subject of frequent litigation in recent years. The United States Supreme Court stated in *Oklahoma City v. Tuttle,* — U.S. —, —, 105 S. Ct. 2427, 2436 (1985), that "the word 'policy' generally implies a course of action consciously chosen from among various alternatives; it is therefore difficult in one sense even to accept the submission that someone pursues a 'policy' of 'inadequate training,' unless evidence be adduced which proves that the inadequacies resulted from conscious choice ...." (Footnote omitted.) Consistent with *Oklahoma City,* the Court also recently stated in *Daniels v. Williams,* 474 U.S. —, —, 106 S. Ct. 662, 665 (1986), that the constitutional guarantee of due process of law is intended to protect against a deliberate decision of a government official or municipality to deprive an individual of life, liberty, or property. "Not only does the word 'deprive' in the Due Process Clause connote more than a negligent act, but we should not 'open the federal courts to lawsuits where there has been no affirmative abuse of power.'" *Id.* at 664–65, citing *Parratt v. Taylor,* 451 U.S. 527, 548–49 (1981).

Finally, in *Pembaur v. City of Cincinnati,* — U.S. —, —, 106 S. Ct. 1292, 1300 (1986), the Court held that "municipal liability under sec. 1983 attaches where— and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."

The federal court of appeals for the second circuit has stated that a municipality can be held liable for a failure to adequately train or supervise if that failure was "so severe as to reach the level of 'gross negligence' or 'deliberate indifference' to the deprivation of the plaintiff's constitutional rights." *Owens v. Haas,* 601 F.2d 1242, 1246 (2d Cir. 1979) (citations omitted). The seventh circuit has similarly held that the mere failure to supervise is not actionable absent a high degree of culpability.

> "At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers .... Inaction by the [municipality] would also not attach liability. There can be liability only when there is an extremely high degree of culpability for inaction." *Lenard v. Argento,* 699 F.2d 874, 885 (7th Cir. 1983) (citation omitted), *reh'g denied* (1983).

And, in *Starstead v. City of Superior,* 533 F. Supp. 1365 (W.D. Wis. 1982), the federal court stated that the plaintiffs' allegations would be sufficient to state a claim under sec. 1983 if,

> "they can be read to assert that defendants' failure to respond to past instances of [improper conduct] evidences either tacit authorization of the offen-

sive acts or reckless disregard of or deliberate indifference to the right of plaintiffs and those similarly situated to be free from such constitutional deprivations." *Id.* at 1371.

This standard strongly suggests that a showing of deliberate indifference or gross negligence must be made before liability can attach. *Id.,* n. 5.

■ Dowd has made two accusations against the city, namely, that (1) the city pursued an official policy of negligently failing to train and supervise its police department employees and that (2) the city failed to discover the falsity of the charges brought against Dowd. The amended complaint alleges that the city pursued an official policy of authorizing the chief of police to supervise and train the city's police officers and of negligently failing to train and supervise Levi as well as the other police officers involved. These allegations do not specifically allege that the city or those officials with authority to set policy for the city have made any sort of "deliberate choice" with respect to a policy or custom of inadequate training or supervision. *Pembaur,* — U.S. at —, 106 S. Ct. at 1300. The complaint does not refer to any specific facts which could establish the existence of any such policy or custom. Absent specific allegations of an affirmative link between the various incidents alleged to be improper and the adoption or use of a policy or custom which could show the municipality's approval of such a policy or custom, plaintiffs' complaint must fail. Municipal liability under sec. 1983 must be based on something more than merely the right to control employees, *Lenard,* 699 F.2d at 885, or the simple failure of an employee to measure up to the conduct of

a reasonable person. *Daniels,* — U.S. at —, 106 S. Ct. at 666. Also, *see, Davidson v. Cannon,* — U.S. —, —, 106 S. Ct. 668, 670 (1986); *Weber v. City of Cedarburg,* 129 Wis. 2d 57, 78, 384 N.W.2d 333 (1986).

We now turn to the sec. 1983 claims brought against the individual respondents. Individuals may be held liable under sec. 1983 when they act under "color of law" to deprive another of constitutionally or statutorily protected rights. A private individual acts under color of law when he or she conspires with state officials to deprive another of those rights. *Tower v. Glover,* 467 U.S. 914, 920 (1984); *Dennis v. Sparks,* 449 U.S. 24, 27–28 (1980).

The complaint alleges that each of the individual respondents conspired to violate Dowd's civil rights by manufacturing false evidence and by suborning and committing perjury at his trial on the sexual misconduct charges. Petitioners point to the various inconsistencies in the testimony of the Lundells and Levi. They also emphasize that the Lundells and Levi were warned of the provisions of Wisconsin's perjury statute at the *in camera* hearing held before Judge Kelsey.

It is evident that sec. 1983 provides no remedy against a private party for that party's testimony in a judicial proceeding. *Briscoe v. LaHue,* 460 U.S. 325, 329 (1983). As stated in *Briscoe,* there are two reasons for this principle: (1) an individual is not acting "under color of law" when testifying in a judicial proceeding, and (2) sec. 1983 does not operate to eliminate the traditional common law concept of absolute privilege for private individuals who testify in a judicial proceeding.

"A witness' apprehension of subsequent damages liability might induce two forms of self-censorship. First, witnesses might be reluctant to come forward to testify .... And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability .... A witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence." *Id.* at 333 (citations omitted).

"Witnesses are 'integral parts of the judicial process' and, accordingly, are shielded by absolute immunity." *Cleavinger v. Saxner,* — U.S. —, —, 106 S. Ct. 496, 500 (1985) (citation omitted). The immunity applies equally to individuals acting "under color of law" who perform official functions in the judicial process, such as judges or prosecutors, as well as police-officer witnesses. *Briscoe,* 460 U.S. at 334, 345. Also, *see, Tower,* 467 U.S. at 920. Thus, each of the respondents is absolutely immune from sec. 1983 liability based upon any testimony given at Dowd's trial. Therefore, as the trial court correctly noted, any finding of liability must be based on out-of-court misconduct.

In this regard, petitioners advance two arguments with respect to the sec. 1983 claims brought against the remaining respondents. They first argue that the police-officer/police-employee respondents (Levi, Frederick, McDermott, and Chris Lundell) are not entitled to qualified immunity for their alleged roles in withholding exculpatory evidence from Rasmussen or for "manufacturing false evidence." With respect to the Carlstroms and Renee Lundell, petitioners further

argue that absolute immunity principles should not operate to shield them from their alleged roles in manufacturing false evidence. We address each of these arguments in turn.

Petitioners first argue that exculpatory evidence was improperly withheld from the special prosecutor. The allegedly exculpatory evidence is the original police report prepared by Johnson. This report, petitioners contend, is exculpatory because it casts doubt on the credibility of B.P., the prosecution's key witness. In addressing petitioners' argument, the trial court focused on statements contained in the original report which were made by Judith Carlstrom. Judith Carlstrom told Johnson that she was certain that two incidents of sexual contact occurred. B.P., in her statement to Johnson, told of four occurrences. The trial court correctly noted that these statements are not necessarily inconsistent with one another. In any case, Judith Carlstrom's statement does not provide Dowd with evidence which could have exonerated him of the charges brought against him.

The other items excised from the original report pertained to: Johnson's initial meeting with the Carlstroms; the statements made by the Carlstroms during that meeting, including Judith Carlstrom's statement that she knew of two instances of sexual contact which occurred "for sure"; and Johnson's use of the ride-along program to encourage B.P. to make a statement. These excised items simply cannot be viewed as exculpatory, and, therefore, the police-employee respondents, particularly Levi, had no duty under authorities such as *United States v. Agurs,* 427 U.S. 97 (1976), to disclose the contents of the original report. Since the information excised cannot be viewed as

exculpatory, petitioners' sec. 1983 claims based on an allegation of a conspiracy to withhold exculpatory evidence must fail. The respondents had no general duty to disclose the contents of the initial report. There is no general constitutional right to discovery of evidence in a criminal case. *Weatherford v. Bursey,* 429 U.S. 545 (1977). Petitioners have failed to establish that the respondents, in withholding the information contained in the initial report, acted to deprive Dowd of a right recognized by the United States Constitution or by federal statute.

Petitioners secondly argue that "the activities of the police officer defendants in constructing a response to Dowd's alibi claim" violated his right to due process. Petitioners specifically refer to: attempts by the various officers, at the November 5 meeting in Levi's office, to establish Dowd's presence in the police department during the time period when the sexual contact was alleged to occur; the "construction" of the hacksaw incident; and the "suppression" of Renee Lundell's identity as a rebuttal witness.

The Dowds allege the existence of a conspiracy to counter Thomas Dowd's alibi. With regard to that allegation, the trial court stated,

> "What facts are at issue? That there was an evil or sinister purpose in the November 5th meeting is only a conclusion and not a reasonable inference. It is a possibility, but not under the evidence presented by the plaintiffs, a reasonable probability. The conflicts in testimony between Chris and Renee Lundell, Chief Levi and Michael Frederick, all relate to the issue of whether the Chief deliberately withheld Renee Lundell's name as an alibi rebuttal witness from the special prosecutor, or, whether, in the words of Jack

Carlstrom, she was a 'secret witness to get that f—— Dowd.' A secret alibi witness is different than the manufacture of false evidence. Whether Renee Lundell was a secretly withheld witness to surprise the defendant is not a material fact to the claim that there was the manufacture of false evidence."

As the trial court noted, Lundell attempted to independently determine exactly when he loaned a hacksaw to Dowd. Lundell informed Levi of this incident during the November 5 meeting, and his recollection of the "hacksaw incident" placed Dowd in New Richmond during the alibi period. Similarly, McDermott and Frederick made independent attempts to place Dowd in the police station during the alibi period. The fact that McDermott, Frederick, Lundell, and Levi informally conferred on November 5 for the purpose of determining whether any of them had any information with which to discredit Dowd's alibi, in and of itself, is simply insufficient for the purpose of establishing that they overtly conspired to deprive Dowd of his constitutional right to due process of law by manufacturing false evidence. While it might not be unreasonable to infer that there was some attempt to keep Renee Lundell's identity as a rebuttal witness secret until the last possible moment, it is undisputed that the possibility of using Renee Lundell as a rebuttal witness was not discussed among the parties until *after* the alleged conspiratorial meeting occurred. And, in any case,

"[i]t does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably. There is no general constitutional right to discovery in a criminal case...." *Weatherford,* 429 U.S. at 559.

The police-officer/police-employee respondents who testified at Dowd's trial, like all other witnesses in a judicial proceeding, are entitled to absolute immunity. *Briscoe,* 460 U.S. at 334, 345. With respect to their activities in attempting to prepare for trial and to rebut Dowd's alibi, the respondents are entitled to qualified immunity under the principles articulated in *Harlow v. Fitzgerald,* 457 U.S. 800 (1982). The defense of qualified immunity is available to

> government officials performing discretionary functions ... insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.* at 818.

Respondents' actions in attempting to marshal evidence with which to rebut Dowd's alibi was not improper and did not operate to deprive Dowd of recognized constitutional rights.

Petitioners finally argue that sec. 1983 liability should be imposed on Renee Lundell and John and Judith Carlstrom, based on the contention that they, too, were involved in a conspiracy to manufacture false evidence. There is no question that these witnesses are entitled to absolute immunity for their in-court testimony. *See, Briscoe, supra.* However, petitioners argue that the immunity is inapplicable to the respondents' out-of-court actions which could be construed as conspiratorial. Petitioners state that,

> "The claim relates to a pretrial conspiracy to manufacture false evidence regarding the hacksaw incident and to subvert the court ordered disclosure of rebuttal alibi witnesses. The defendants kept Renee Lundell's identity as a rebuttal witness from Special Prosecutor Rasmussen until the

morning of the last day of trial. She was overheard to say, 'Nobody is supposed to see me.' [John] Carlstrom stated, 'She's the witness that's going to nail that f—— Dowd.'"

We believe that it would be purely conjectural to place the label "conspiracy" on these out-of-court statements made by John Carlstrom and Renee Lundell. Neither was a participant in the November 5 meeting in Levi's office, and the record is utterly devoid of any other evidence which could raise even a weak inference of a conspiracy on their part. It is equally preposterous to argue that Judith Carlstrom was involved in a conspiracy to "manufacture" evidence. Her participation in the Dowd matter was limited to (1) her initial complaint to the authorities with respect to her suspicions about Dowd's sexual involvement with B.P. and (2) her testimony at the Dowd trial. No inferences of conspiratorial conduct can be drawn from her involvement in this case.

We make note of the fact that in their brief to this court, petitioners appear to have abandoned some of the allegations originally made in their complaint. They advance no arguments and present no evidence whatsoever to support the statements made in the complaint alleging that each of the individual defendants conspired to violate Dowd's civil rights by (1) falsely accusing him of sexual misconduct with B.P.; (2) causing him, without probable cause, to be brought before the New Richmond police and fire commission under disciplinary charges; and (3) causing him to be charged for instances of sexual misconduct with B.P., without probable cause. The facts fail to support any of these allegations. The trial court was correct in

563

entering summary judgment in respondents' favor with respect to these allegations.

## II.

The next issue we must address deals with whether material fact issues exist with respect to petitioners' claim for relief under sec. 134.01, Stats.[3]

The trial court determined that reasonable inferences could be drawn from the evidence that Levi, the Lundells, Frederick, and John Carlstrom conspired to conceal the identity of Renee Lundell as a rebuttal witness. The court stated,

> "[T]here are reasonable inferences which can be drawn from the plaintiffs' evidence that there was a conspiracy, that its goal was to enhance the probability of a conviction of Thomas Dowd by the stratagem of concealing rebuttal evidence wrongfully until its surprise introduction at trial, with the malicious intent of destroying Thomas Dowd's police career."

The trial court also determined that there was a material issue of fact with regard to whether there was a conspiracy to commit perjury in rebuttal testimony. However, the trial court determined that

---

[3] Section 134.01 provides: "**Injury to business; restraint of will.** Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of wilfully or maliciously injuring another in his reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500."

despite the possible existence of a conspiracy, sec. 134.01, Stats., did not provide the Dowds with a remedy because "no damages were caused by the alleged conspiratorial actions. The trial with all of its cost, emotion and publicity would have occurred without the conspiracies. ... Only damages caused by acts pursuant to a conspiracy give rise to a civil action." The appeals court affirmed, stating that no remedy is afforded for a conspiracy to commit perjury.

Petitioners argue that the grant of the motions for summary judgment was improper because, though the criminal charges were ultimately dismissed, respondents' actions nevertheless caused Dowd to suffer injuries for loss of reputation in the community, pain, suffering, loss of society and companionship with his wife, and injury to his relationship with his family and employer. Dowd also seeks damages for the costs of his defense against the criminal charges and in the disciplinary proceedings.

We believe that the entry of summary judgment in favor of the respondents was proper. A remedy is available to an individual who can establish that sec. 134.01, Stats., has in fact been violated, *provided that* the violation of the statute has caused an injury. "[A] conspiracy for the purpose of injuring another, if it results in damage to the other, is an offense for which there may be recovery." *Radue v. Dill,* 74 Wis. 2d 239, 246, 246 N.W.2d 507 (1976). "The gravamen of a civil action for damages resulting from an alleged conspiracy is thus not the conspiracy itself but rather the civil wrong which has been committed pursuant to the conspiracy and which results in damage to the plaintiff." *Onderdonk v. Lamb,* 79 Wis. 2d 241, 246, 255

N.W.2d 507 (1977). Also, *see, Singer v. Singer*, 245 Wis. 191, 195, 14 N.W.2d 43 (1944).

Absent actual damages caused by the respondents' alleged conspiratorial conduct, there can be no remedy. Even if conspiratorial in nature, respondents' conduct did not *cause* Dowd's injuries. The facts establish that the subject of using Renee Lundell as a rebuttal witness was not even mentioned until the evening of November 5, at the earliest. At that time, charges had already been brought, a trial was already scheduled, and considerable legal expenses in preparation for that trial had no doubt already been incurred. These expenses would have been incurred even if Renee Lundell had never testified. Dowd's reputation was already undoubtedly damaged by the initiation of the charges against him, long before the allegedly conspiratorial conduct occurred.

Renee Lundell's testimony dealt not with the issue of whether Dowd was guilty of the crimes charged, but with the issue of whether he was a credible witness with respect to his alibi. Her testimony related *solely* to attempting to place Dowd in New Richmond during the alibi period. Thus, her testimony caused no damage to Dowd's reputation over and above the injury that was invariably caused by the *initiation* of formal criminal charges against him. Furthermore, Rasmussen ultimately concluded that the charges brought against Dowd should be dismissed, not because of a determination that B.P. was incredible or that Dowd was innocent, but because of the inconsistencies which arose as a direct result of the testimony of the various rebuttal witnesses on collateral credibility issues. The charges were dropped *because of* the testimony of the rebuttal witness, the testimony which was alleged to be the "fruit" of the

conspiracies to commit perjury and to conceal the identity of Renee Lundell.

The most petitioners have been able to establish is that material fact issues may exist with respect to the formation and maintenance of a conspiracy. But "there is no such thing as a civil action for conspiracy." *Singer,* 245 Wis. at 195. Rather, the "gist" of an action for damages under sec. 134.01 is the existence of damages caused by the conspiratorial conduct. *Id.* Also, *see, Onderdonk,* 79 Wis. 2d at 246–47. Summary judgment was properly entered in favor of the respondents because their actions did not cause Dowd's injuries.

## III.

The final issue deals with whether the city of New Richmond was properly awarded attorney's fees pursuant to 42 U.S.C. sec. 1988.[4] In a memorandum decision and order dated November 12, 1984, Judge Barland awarded attorney's fees to the city in the amount of $9,380.10, referring for support to *Christianburg Garment Co. v. EEOC,* 434 U.S. 412 (1978). *Christianburg* held that "a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Id.* at 422.

---

[4]That section provides, in part, that, "In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

Applying this standard, the trial court stated that,

> "The City of New Richmond's claim for attorney's fees as a prevailing defendant appears to be stronger than that of the individual defendants, because the plaintiffs' complaints were phrased in terms of negligence—far short of a constitutional deprivation under 42 U.S.C. ¶ 1983. No evidence of substance was produced by the plaintiffs that the City had a policy of allowing a police officer to negligently fail to train its police officers in the proper investigation of cases, especially sexual assault cases. There was no showing of any constitutional right to have such cases properly investigated. The complaints against the City lay far from the ambit of constitutional dereliction. The plaintiffs' claims against the City of New Richmond were patently groundless."

The appeals court affirmed, stating that "[t]he record reflects no legal or factual basis for Dowd's claim against the city." Petitioners have failed to establish with the requisite specificity that the city pursued an official policy or ratified a custom of negligently training and/or supervising its police department personnel. The existence of such a policy or custom is at the core of a sec. 1983 claim against a municipality. *Pembaur,* 106 S. Ct. at 1300. Petitioners have done no more than allege negligence, which allegation we find to be groundless. We agree with the trial court that this allegation of mere negligence was not sufficient to state a claim of a deprivation of rights in *constitutional* proportions. Therefore, we hold that the trial court acted within its sound discretion in awarding attorney's fees to the city. It properly determined that the

petitioners' failure to establish a constitutional deprivation satisfied the *Christianburg* standard governing the award of attorney's fees.

To summarize, we hold that the entry of summary judgment in respondents' favor was proper with respect to each of the claims brought against them. Furthermore, we hold that the trial court was correct in awarding attorney's fees to the city of New Richmond, based on its determination that the sec. 1983 claim against the municipality was without legal foundation.

*By the Court.*—The decision of the court of appeals is affirmed.

CALLOW, J., took no part.