Vincent INSOLIA and Karen Insolia, Billy Mays and Phyllis Mays, Maureen Lovejoy and Lee Lovejoy, Charles Caldwell, personal representative of Charles Caldwell, Sr., Deceased, on behalf of themselves and as representatives of a class of all others similarly situated,

Physicians Plus Insurance Corporation, Wal–Mart Group Associates, Insurance, Champus, parties joined pursuant to Wis.Stat. sec. 803.03, Plaintiffs,

v.

PHILIP MORRIS INCORPORATED; R.J. Reynolds Tobacco Company; Brown & Williamson Tobacco Corporation; Lorillard Tobacco Company; Liggett Group Inc.; The Council for Tobacco Research—U.S.A., Inc.; and The Tobacco Institute, Inc., Defendants.

No. 97–C–0347–C.

United States District Court, W.D. Wisconsin.

Dec. 16, 1998.

James A. Olson, Lawton & Cates, S.C., Madison, WI, for Vincent Insolia, Karen Insolia.

Thomas J. Bastin, Sr., Brennan, Steil, Basting & MacDougall, Janesville, WI, for State of Wisconsin.

Richard Schmidt, Boardman, Suhr, Curry & Field, Madison, WI, for Physicians Plus Ins.

Michael T. Graham, Jackson, Lewis, Schnitzler and Krupman, Chicago, IL, for Associates' Health and Welfare.

Mullen J. Dowdal, Asst. U.S. Attorney, Madison, WI, for Donna Shalala, plaintiff.

Michael L. Zaleski, Quarles & Brady, Madison, WI, for Philip Morris Incorporated.

James Clark, Foley & Lardner, Milwaukee, WI, for R.J. Reynolds Tobacco Company.

Timothy J. Pike, Peterson, Johnson & Murray S.C., Milwaukee, WI, for Brown & Williamson Tobacco Corp.

Ralph A. Weber, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C., Milwaukee, WI, for B.A.T. Industries P.L.C.

Bruce A. Schultz, Coyne, Niess, Schultz, et al., Madison, WI, for Lorillard Tobacco Company.

Robert B. Raschke, Lindquist & Vennum, Minneapolis, MN, for Liggett Group Inc.

James F. Gebhart, Attorney at Law, Madison, WI, for Hill & Knowlton, Inc.

John H. Schmid, Axley Brynelson, Madison, WI, for The Council for Tobacco Research.

John Koeppl, Attorney at Law, Madison, WI, for The Tobacco Institute, Inc.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for declaratory and monetary relief brought by a group of individuals on behalf of a proposed class of Wisconsin residents, all of whom began smoking before 1964, consumed at least one package of cigarettes a day for twenty years and have been diagnosed with lung cancer. The defendants are the leading manufacturers of tobacco products in this country as well as two industry trade groups, the Council for Tobacco Research and the Tobacco Institute. This court has jurisdiction over plaintiffs' state law claims of negligence, strict liability, intentional exposure to a hazardous substance and civil conspiracy under the diversity of citizenship statute. 28 U.S.C. § 1332.

The case is before the court on plaintiffs' motion for class certification and the motion of certain defendants to file a surreply in opposition to class certification. Defendants have not articulated a valid reason for filing additional argument. They emphasize the length of plaintiffs' response brief but neglect to mention that their brief in opposition weighs in at a whopping 70 pages. Defendants complain that plaintiffs raised new issues in their response but do not identify any such issues. Defendants' motion will be denied.

I conclude that plaintiffs are unable to satisfy either part of the class certification analysis under Fed.R.Civ.P. 23. Briefly, any attempt to litigate the claims of a class this unwieldy would degenerate into an interminable series of mini-trials that would bear little if any resemblance to a class action lawsuit. Plaintiffs' motion will be denied.

Decisions on class certification should not be conditioned upon the merits of a case. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Despite this limitation, the court may look beyond plaintiffs' complaint because

> [e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims. The typicality of the representative's claims or defenses, the adequacy of the representative, and the presence of common questions of law or fact are obvious examples. The more complex determinations required in Rule 23(b)(3) class actions shall entail even greater entanglement with the merits.

For this reason, the court will examine depositions, expert reports and affidavits to determine whether class certification is appropriate. The following recitation of facts is based on these sources and on plaintiffs'

second amended complaint and is undertaken for the sole purpose of deciding this motion.

## FACTS

### A. *Defendants*

Defendant Philip Morris Incorporated is a Virginia corporation with its principal place of business in New York, New York. Defendant R.J. Reynolds Tobacco Company is a New Jersey corporation with its principal place of business in Salem, North Carolina. Defendant Brown & Williamson Tobacco Corporation is a Delaware corporation with its principal place of business in Louisville, Kentucky. Defendant Lorillard Tobacco Company is a Delaware corporation with its principal place of business in New York City. All defendants named in this paragraph have manufactured and distributed tobacco products in Wisconsin during the times relevant to this lawsuit.

Defendant Council for Tobacco Research is the successor in interest to the Tobacco Industry Research Committee. It is a New York corporation with its principal place of business in New York City. Defendant Tobacco Institute, Inc., a New York corporation with its principal place of business in Washington, D.C., is funded by the tobacco industry for the ultimate purpose of promoting the sale of cigarettes.

### B. *Class Representatives*

#### 1. *Vincent Insolia*

Plaintiff Vincent Insolia, a 74–year old resident of Wisconsin, began smoking in 1934 or 1935, when he was 12 years old. He did so to be cool and because a friend told him that he would be "chicken" if he did not try a cigarette. Shortly afterward, his body began to crave cigarettes. Influenced by the recommendations of friends, curiosity and personal preference, Insolia smoked many different brands of cigarettes, both filtered and unfiltered. He can remember seeing no cigarette advertisements between the age of 12 and 18. At some point during this period, he began smoking at least one pack a day. From the time he joined the army at the age of 18 until he stopped smoking in 1973 or 1974, Insolia maintained a three-package a day habit. After leaving the army in 1945 or 1946, he moved to Chicago, where he stayed for approximately the next twenty years,

working as a brick layer. In 1997, Insolia was diagnosed with lung cancer.

Insolia did not notice the Surgeon General warnings that began appearing on cigarette packages in 1966 until after he had quit. As an adolescent and young adult, Insolia was not skeptical about cigarette advertisements. As a young man, even if a doctor had told Insolia to quit smoking, he probably would not have followed this advice because he needed to smoke. Around 1973 or 1974, Insolia was experiencing chronic headaches and coughing. One morning, he looked in the mirror and prayed for help to quit smoking. He has not smoked another cigarette since this time.

#### 2. *Billy Mays*

Plaintiff Billy Mays has resided in Wisconsin since 1988. Before this time, he lived in Texas, Washington, Oklahoma and Korea. Before Mays took up smoking, he knew that his parents, both of whom smoked, strongly disapproved. His older brother had been punished severely for smoking against his parents' wishes. Nevertheless, Mays tried his first cigarette on a camping trip with some friends when he was 13 or 14 in 1951 or 1952. Smoking made him feel grown up and provided a pleasurable "buzz." He smoked as often as he could but did not do so on a regular basis until he was around 16. Mays continued to smoke even after his father found out about his habit and gave him "a little bit of a life threat." As an adult, Mays smoked despite warnings from the Army, his doctors and his family. By the time he saw the Surgeon General warnings in 1966, he had blamed smoking for his lack of physical stamina.

Mays's favorite brands were Lucky Strikes, Pall Mall and Winston. Occasionally, he smoked other brands. For example, sometimes he smoked Marlboro cigarettes but not often because he considered them too strong. Winston remained Mays's brand of choice from sometime in the 1960s to the 1980s, when they became prohibitively expensive. At that point, Mays did not stick to a regular brand. Instead, he bought whatever was the least expensive. Mays found it easier to switch to cheaper brands because

he no longer appreciated the flavor of Winstons. In fact, around the late 1960s or early 1970s they began to leave a bad taste in his mouth.

Mays believes that he was addicted to smoking because he tried to quit many times but was unable to do so. He arrived at this realization in 1957, when he made his first unsuccessful effort to quit. In 1994, he entered a Veteran's Administration smoking cessation program that used nicotine patches and biweekly monitoring. At first, Mays did not believe the program would help because he had tried to quit many times without success. Despite his skepticism, Mays stopped smoking for good.

In 1995, Mays was diagnosed with lung cancer. Long before this time, Mays had scarred the inside of a lung after inhaling welding and ammonia fumes. Referring to this injury, Mays's physician has stated: "It is known that [ ] malignancies do arise out of scars, and this man had significant right lower lobe chronic changes. It is possible that his malignance arose from this. The proof would be very difficult to come by, but is certainly entirely possible."

### 3. Maureen Lovejoy

Plaintiff Maureen Lovejoy began smoking in approximately 1953 at the age of sixteen. She did so because she thought it was cool. For most of her adult life, Lovejoy has read newspapers, magazines and books but cannot recall ever having read a statement about smoking and health by any cigarette manufacturer. When the Surgeon General's warning first began appearing on cigarette packages, Lovejoy ignored it. Despite similar admonitions from her family, friends and doctors, Lovejoy continued to smoke for many years. After about eight unsuccessful attempts, Lovejoy quit smoking for good in 1996. Two weeks earlier, her husband had also managed to quit after suffering heart problems. Lovejoy feared that if she continued to smoke, her husband would take up the habit again and die because of it. Six months later, Lovejoy was diagnosed with lung cancer.

### 4. Charles Caldwell, Sr.

Plaintiff Charles Caldwell, Sr. died in 1995. His son, Charles, Jr., remembers that his father smoked at least three different brands of cigarettes but has no personal knowledge about when Charles, Sr. began smoking or why. On several occasions, Charles, Sr. tried to quit smoking. He made and broke many New Year's resolutions to quit. Sometimes he relied on hard candy or chewing tobacco for help but inevitably he would lose his resolve after a day or two.

### C. Cigarettes, Cancer and Conspiracy

In 1952, a British researcher published a study showing a correlation between smoking and lung cancer. In December 1953, another study conducted in the United States identified cigarette "tar" as a probable carcinogen. That same month, the chief executive officers of the leading United States tobacco manufacturers convened at the Plaza Hotel in New York City. With the assistance of a public relations firm, Hill & Knowlton, the tobacco industry devised a strategy to "promot[e] cigarettes and protect [itself] from these and other attacks that may be expected in the future." Two weeks later, on January 4, 1954, the companies formed the Tobacco Industry Research Committee, the predecessor to defendant Council for Tobacco Research. To publicize this event, the companies took out a full page advertisement in almost 450 newspapers across the county. In this "Frank Statement to Cigarette Smokers," the industry pledged to "cooperate closely with those whose task is to safeguard the public health" as well as conduct scientific research of their own under the aegis of the newly formed Research Committee.

A memorandum written by Hill & Knowlton in preparation for the 1953 conference noted that a research director employed by one of the tobacco companies saw a substantial benefit in being the "first to produce a cancer free cigarette." At the end of this memorandum, there are several "quick suggestions" proposed by tobacco industry officials, including: "9. Develop some understanding with companies that, on this problem, none is going to seek a competitive advantage by inferring to its public that its product is less risk than others. (No claims that … anything … makes a given brand less likely to cause you-know-what. No

"Play–Safe–with–Luckies" idea—or with Camels or with anything else.)"

In 1958, the industry formed a trade group, defendant the Tobacco Institute. In a 1972 memorandum, the institute's vice president, Fred Panzer, characterized the course charted by the organization as a three-pronged strategy, consisting of creating doubt about the health effects of smoking, advocating the public's right to smoke and promoting objective scientific research as the only way of resolving whether tobacco is a health threat. Panzer characterized this approach as a "holding strategy" and recommended a new, three-pronged "scenario for action" focused on selling the notion that smoking is one of many risk factors associated with certain illnesses. Panzer proposed assembling a group of prestigious experts to design and conduct a study that would support this position. If the results proved favorable, defendant would then present them "to carefully selected members of the following key groups: Senate, House, Cabinet, White House, State Governors, Medical School and University Presidents, Scientific Bodies." Consistent with the strategies outlined in this memorandum, the institute had taken out at least two advertisements in 1970 similar to the 1954 "Frank Statement."

Despite public and private statements regarding the need for objective scientific research, at least one member of the Council for Tobacco Research, defendant Lorillard, expressed some concern about the degree of control exercised by lawyers over this process. At a 1978 Council for Tobacco Research meeting, an industry lawyer opened the proceedings by explaining that the Council began as "an industry 'shield' " in response to "statistical accusations ... leveled at the industry." After the lawyer noted that tobacco industry foes no longer invested much in health research, another industry official present at the meeting offered the following suggestion: "It is extremely important that the industry continue to spend their dollars on research to show that we don't agree that the case against smoking is closed."

In 1961, R.D. Wakeman, the vice president of research and development for defendant Philip Morris, drew up a proposal for research into the "reduction of carcinogens in smoke." Wakeman observed that this would be a difficult objective because "[c]arcinogens are found in practically every class of compounds in smoke."

In the 1960s, defendant R.J. Reynolds established a research facility in North Carolina. Using laboratory mice, scientists studied many different subjects related to smoking and health, including the causal connection between cigarettes and emphysema. Although the scientists had made significant progress, defendant R.J. Reynolds disbanded the institute and fired its employees in a single day. No document related to the research conducted by this facility has been disclosed by R.J. Reynolds. Several years later, in 1981, R.J. Reynolds expressed concern about whether defendant Philip Morris "live[d] up to the alleged gentlemen's agreement of not having animal laboratory facilities on their premises in this country."

### D. *Addiction*

In the 1953 memorandum prepared by Hill & Knowlton, the author of this document noted that a tobacco industry researcher had commented, "It's fortunate for us that cigarettes are a habit they can't break." In 1962, a senior scientist for non-party British American Tobacco Corporation (BATCO), a subsidiary, of non-party B.A.T. Industries P.L.C., summarized the objective of a research proposal: "What we need to know above all things is what constitutes the hold of smoking, that is, to understand addiction." In 1963, two outside researchers hired by BATCO submitted a study entitled "A Tentative Hypothesis on Nicotine Addiction." At a 1971 research meeting on nicotine attended by tobacco industry scientists, "Sir Charles [Ellis] started ... by saying that he had first brought out the concept that we are in a nicotine rather than a tobacco industry and then set up the above projects to sell this concept to management." William Dunn, a researcher for defendant Philip Morris, expanded on this notion in a speech delivered at a 1972 conference sponsored by defendant Council for Tobacco Research: "The majority of conferees would go even further and accept the proposition that nicotine is the active constituent of cigarette smoke. Without nicotine, the argument goes, there would

be no smoking." Dunn encouraged his listeners to "[t]hink of the cigarette pack as a storage container for a day's supply of nicotine" and "the cigarette as a dispenser for a dose of nicotine." In a 1972 memorandum, Charles Teague, a senior researcher for defendant R.J. Reynolds, stated enthusiastically: "Happily for the tobacco industry, nicotine is both habituating and unique in its variety of physiological actions ..." Teague warned that "if we meekly accept the allegations of our critics and move toward reduction or elimination of nicotine from our products, then we shall eventually liquidate our business."

## OPINION

### A. *Introduction*

■ Fed.R.Civ.P. 23 requires a two-step analysis to determine whether class certification is appropriate. *See Rosario v. Livaditis,* 963 F.2d 1013, 1017 (7th Cir.1992). Plaintiffs bear the burden of showing that these requirements have been met. *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Retired Chicago Police Association v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993). First, plaintiffs must satisfy the four prerequisites in Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequate representation). *See id.*

Next, if the four threshold requirements set forth in Rule 23(a) are met, plaintiffs must satisfy at least one of the three subdivisions of Rule 23(b). "The three categories set forth in Rule 23(b) attempt to articulate three functional occasions when, after the four basic prerequisites are satisfied, class treatment of an action is appropriate." 1 Newberg & Conte, *Newberg on Class Actions* § 4.01 (3d ed.1992). Plaintiffs contend that their proposed class is suitable under subdivision (b)(3), invoked when questions common to the entire class predominate over questions applicable only to individual class members and when a class action is superior to other methods of adjudicating the controversy.

Plaintiffs propose a class of all persons who:

a. Consumed cigarettes in Wisconsin;

b. Reside in the state or did so at time of their deaths;

c. Had begun smoking at least one year before the Surgeon General's Report in 1964;

d. Have been diagnosed with lung cancer after April 18, 1994;

e. Had a 20 pack-year[1] history of smoking cigarettes at the time of diagnosis, and

f. Have not received Medicaid or any payments from Wisconsin for treatment of their lung cancer.

Pls.' Second Am. Compl., dkt. # 83, at ¶ 8. In addition, the class is defined to include the spouses, representatives and administrators of the estates of such persons.

I conclude that although the proposed class satisfies the numerosity and commonality requirements of Fed.R.Civ.P. 23(a), the claims and defenses of the class representatives are not typical of the claims and defenses of potential class members because they do not arise from one another. Even if plaintiffs met the typicality requirement, they fall short of satisfying the predominance test of Rule 23(b)(3) by a wide margin. Individual issues such as medical causation, reliance and comparative negligence predominate over the lone question common to the entire class, whether defendants conspired to misrepresent the addictive nature and adverse health effects associated with tobacco use.

### B. *Rule 23(a)*

#### 1. *Numerosity*

■ As long as it is not purely speculative, only a good faith estimate of the size of the proposed class is required. *Arenson v. Whitehall Convalescent & Nursing Home, Inc.,* 164 F.R.D. 659, 662–663 (N.D.Ill.1996).

---

**1.** A "pack year" is one package of cigarettes a day for an entire year.

Although plaintiffs do not have to specify the exact size of their class, they "cannot rely on conclusory allegations that joinder is impracticable or on speculation as to the size of the class." *Marcial v. Coronet Insurance Company*, 880 F.2d 954, 957 (7th Cir.1989) (citing *Vergara v. Hampton*, 581 F.2d 1281, 1284 (7th Cir.1978); *Valentino v. Howlett*, 528 F.2d 975, 978 (7th Cir.1976)). Numerosity problems can be resolved later in the suit. *See id.*

Defendants do not challenge whether plaintiffs can satisfy the numerosity requirement. Quite the opposite, defendants suggest that plaintiffs have low-balled their estimate of the size of the proposed class in order to diminish concerns regarding the manageability of the case. Plaintiffs estimate a class numbering between 500 and 1,000 members. This estimate is based on a finding by plaintiffs that of the 3068 new cases of lung cancer diagnosed in Wisconsin in 1995, 85–95% of those deaths are attributable to cigarette smoking. Aff. of James Olson, dkt. # 105, ex. 27. From this statistic, plaintiffs calculate that about 8,000 Wisconsin residents would qualify as class members but only 500 – 1,000 would elect to join. Plaintiffs' counsel has averred that he has already been contacted by 47 persons who meet the class definition and who have expressed an interest in participating in the lawsuit. This figure represents 5–10% of the estimated class size. Given that plaintiffs have managed to generate this level of interest without formal class notification or any effort to publicize the case, I am inclined to agree that plaintiffs' estimate is far too conservative. Obviously, the numerosity requirement is not defeated because a proposed class is *more* numerous than reckoned by the class representatives. However, this issue does have important ramifications for other considerations that will be taken up later in the opinion.

### 2. *Commonality and typicality*

The commonality and typicality requirements are closely related. *See Rosario*, 963 F.2d at 1018. For example, both share a mutual objective: to "ensure that only those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class." *See Mace v.*

*Van Ru Credit Corp.*, 109 F.3d 338, 341 (7th Cir.1997). Despite these similarities, important distinctions remain. Commonality focuses on the characteristics of the class. *See* 1 Newberg & Conte, at § 3.13. By contrast, typicality is more concerned with "the desired characteristics of the class representative." *Id.* Plaintiffs maintain that three issues are amenable to a finding of commonality and typicality: 1) whether defendants engaged in a conspiracy; 2) whether nicotine is addictive; and 3) whether smoking causes lung cancer. Pls.' Br., dkt. # 100, at 24.

#### a. *Commonality*

■ "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Rosario*, 963 F.2d at 1018. Some factual variation in the details of individual claims do not defeat a finding of commonality. *Id.* at 1017 (citations omitted). Courts give Rule 23(a)(2) a "highly permissive reading," *Markham v. White*, 171 F.R.D. 217, 222 (N.D.Ill.1997), requiring plaintiffs to show only that there is more than one issue of law or fact in common. *See Wagner v. NutraSweet Company*, 170 F.R.D. 448, 451 (N.D.Ill.1997). Though permissive, the commonality requirement is not a mere pro forma exercise. Consistent with the requirement's purpose, an issue of law or fact is not "common" unless its resolution "will advance the litigation." *See Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir.1998). For example, a proposed class of former beauty school students satisfied the commonality requirement by raising the common legal question whether the owner of their alma mater operated the school to defraud and deceive prospective students. *See Rosario*, 963 F.2d at 1018. That some students had managed to pass a licensing exam did not defeat commonality. *See id.* By prosecuting their own claims, class representatives would advance the claims of class members who did not fare so well professionally.

■ As a general matter, resolving whether nicotine is addictive and whether smoking causes cancer would do little to advance this litigation. Although these questions are

common to class representatives and class members alike, this is because addiction and causation are common to virtually every plaintiff in virtually every one of the many hundreds of other tobacco products liability lawsuits pending throughout the country. Addressing this issue in the context of another mass tort phenomenon, the Court of Appeals for the Second Circuit observed astutely:

> The relevant question, therefore, is not whether Agent Orange has the capacity to cause harm, the generic causation issue, but whether it did cause harm and to whom. That determination is highly individualistic, and depends upon the characteristics of individual plaintiffs (e.g. state of health lifestyle) and the nature of their exposure to Agent Orange. Although generic causation and individual circumstances concerning each plaintiff and his or her exposure to Agent Orange thus appear to be inextricably intertwined, the class action would have allowed generic causation to be determined without regard to those characteristics and the individual's exposure.

*In re Agent Orange Product Liability Litigation*, 818 F.2d 145, 165 (2d Cir.1987). But for the existence of the so-called military contractor defense, the court doubted whether there existed "few, if any, common questions of law." *Id.* This reasoning applies with equal force to the addiction and causation issues relied on by plaintiffs. For example, plaintiff Billie Mays's physician indicated that Mays's cancer may be attributable to chemical scarring, not smoking. Plaintiff Vincent Insolia quit smoking over twenty years before being diagnosed with lung cancer. Defendants note correctly that plaintiffs' own expert witness testified that a smoker's risk of developing lung cancer drops to the level of a nonsmoker ten years after quitting. *See* Dep. of John H. Griest, dkt. # 127, at 173. This same expert has testified that check-lists and global assessments are not an appropriate substitute for the kind of fact-specific clinical diagnosis necessary to determine whether a smoker is addicted to nicotine.

██ Plaintiffs manage to make a more compelling case regarding their claim of civil conspiracy but only marginally so. In the abstract, "civil conspiracy" is not a cause of action in Wisconsin. Instead, there can be "an action for damages caused by acts pursuant to a conspiracy but none for the conspiracy alone." *Radue v. Dill*, 74 Wis.2d 239, 241, 246 N.W.2d 507, 509 (1976). Framed this way, there are four elements to plaintiffs' claim of civil conspiracy: 1) the formation and maintenance of a conspiracy; 2) the wrongful act or acts committed pursuant to the conspiracy; 3) actual damages suffered by plaintiffs; and 4) a causal nexus between such damages and the alleged conspiratorial conduct. *See Dowd v. City of New Richmond*, 137 Wis.2d 539, 566–567, 405 N.W.2d 66, 77 (1987); *Onderdonk v. Lamb*, 79 Wis.2d 241, 246, 255 N.W.2d 507, 510 (1977). Although the last three of these inquires do not turn on common questions of fact or law, plaintiffs would advance the litigation for themselves and for class members by establishing the existence of a conspiracy. Plaintiffs could do so by presenting "facts that show some agreement, explicit or otherwise, between the alleged conspirators on the common end sought and some cooperation toward the attainment of that end." *Augustine v. Anti–Defamation League of B'nai B'rith*, 75 Wis.2d 207, 216, 249 N.W.2d 547, 552 (1977). Granted, this would leave a great deal for individual class members to accomplish on their own behalf but even such incremental gains satisfy the permissive nature of the commonality requirement.

### b. Typicality

██ The problems identified above take on larger significance in the context of the next requirement, that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Rule 23(a)(3). Plaintiffs' claims satisfy the typicality requirement "if they arise[ ] from the same event or practice or course of conduct that gives rise to the claims of other class members and [their] claims are based on the same legal theory." *Retired Chicago Police*, 7 F.3d at 597–98 (quoting *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983)). This does not mean that all class members must have suffered the same injury as the class representatives. *See De La Fuente*, 713 F.2d at 232. The operative

considerations are defendants' alleged conduct and plaintiffs' legal theories. *See id.* For this reason, "[f]actual distinctions between the claims of the named plaintiffs and those of other class members" do not preclude a finding of typicality; "similarity of legal theory may control even in the face of differences of fact." *Id.* at 232. To represent class members effectively, the claims of named plaintiffs must "have the same essential characteristics as the claims of the class at large." *Id.* Properly applied, these guidelines should uphold the rationale behind the typicality requirement, namely that "a plaintiff with typical claims will pursue his or her own self-interest in the litigation and in so doing will advance the interests of the class members, which are aligned with the those of the representative." 1 Newberg and Conte, at § 3.13.

Though some factual distinction among the claims of proposed class members is expected under the typicality requirement, three opinions of the Court of Appeals for the Seventh Circuit demonstrate that limits do exist, particularly when the claimed injury is tied to a complex course of conduct engaged in by the defendants over a long period of time, as opposed to a single act to which all class members have been exposed equally. For example, *Retired Chicago Police Ass'n,* 7 F.3d at 584, concerned a class action brought by a law enforcement organization against Chicago and various pension funds on behalf of retired city employees. In essence, the plaintiffs claimed that the defendants had promised free lifetime health care but later reneged on this promise. As observed by the court,

> [t]hese claims turn on representations allegedly made by the City and the Funds to various groups of city workers. . . . Appellants have not provided any evidence other than speculation that any alleged communications by the City or the Funds to the fire, laborer, or municipal annuitants were the same as those made to the police. Even among the police, the record indicates that some annuitants heard these communications at retirement seminars, some read a booklet, some heard through word of mouth, and many simply had a general impression of the benefits to which

they were allegedly entitled. Some were ignorant of any alleged promises.

*Id.* at 597. In contrast to this quandary, a proposed class of individuals who had received the same collection letter from the same debt collector demanding the same illegal collection fee satisfied the typicality requirement. *See Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir.1998). This does not mean that intricate factual patterns present insurmountable obstacles to class certification. As illustrated by *De La Fuente,* it means that class representatives in such cases are held to more rigorous standards. *De La Fuente,* 713 F.2d 225, involved a class of migrant farmworkers that challenged the recruitment and disclosure practices of an agricultural company. Three factors persuaded the court that the plaintiffs had satisfied the typicality requirement: 1) the allegedly unlawful practices "remained essentially unchanged throughout the years in question"; 2) "[a]ll members of the class were subject to the same allegedly unlawful practices"; and 3) these unlawful practices equally affected all members of the class. *Id.* at 233. Similarly, the putative class in *Rosario,* 963 F.2d at 1016, satisfied the typicality requirement even though some members had enrolled as students in the beauty school for as little as one and a half weeks, while others had completed 1500 hours of course work. Despite this variation, class members shared this in common: they had all been exposed to the same fraudulent recruitment practices and had attended the same overcrowded courses conducted in the same squalid, roach-infested facilities with the same broken, substandard equipment. *See id.* at 1016–1018.

Plaintiffs' claim of civil conspiracy is based primarily on an alleged campaign of misinformation designed to conceal and distort the truth about the adverse health effects of smoking and the addictive nature of nicotine. Dkt. # 83 at ¶ 57. Specifically, plaintiffs allege that defendants "intentionally misrepresented" their knowledge about these matters and "fraudulently concealed" other crucial information. *Id.* To recover for fraud or misrepresentation in Wisconsin, a plaintiff must show reliance. *See Collins v. Eli Lilly Co.,* 116 Wis.2d 166, 202, 342 N.W.2d 37, 54 (1984). Thus, as in *De La Fuente* and *Re-*

*tired Chicago Police,* the essential facts necessary to sustain a judgment under plaintiffs' conspiracy claim fall into two discrete categories: 1) representations allegedly made by defendants to individual class members over the course of many years through television, radio, printed media and direct mail contact; and 2) the extent to which class members relied upon these representations in choosing to smoke.

On these points, the record reveals that the conspiracy claims of class representatives are not typical of one another, much less typical of entire proposed class. There is a wide variation among plaintiffs Vincent Insolia, Billy Mays, Maureen Lovejoy and Charles Caldwell regarding their likely exposure to tobacco industry propaganda and the extent to which this propaganda has played a role in their decision to smoke. These differences are worth emphasizing because they illustrate the fundamental problems with plaintiffs' typicality argument: all members of the proposed class were not subject to the same allegedly unlawful statements and these statements did not affect class members equally. To the extent that these statements reached class members, they did so through different channels and with varying degrees of success. Complicating matters further, adults and adolescents alike are susceptible to a great number of influences, many of which have but marginal relation to defendants' alleged conspiratorial acts. A class member's parents, siblings, spouse, children, physician, colleagues, friends and the like are certainly capable of playing a large role in the decision to smoke; just how large, is bound to vary from plaintiff to plaintiff. I acknowledge that some of plaintiffs' allegations apply equally to all potential class members. For example, plaintiffs contend that defendants conspired to manipulate the level of nicotine in cigarettes in order to keep their customers hooked on tobacco products. If true, all class have been affected in some way by this practice. In light of the complexities associated with determining who is addicted and why, this is too thin a reed on which to hang the fortunes of hundreds of other claimants, particularly given the other problems identified.

## C. *Rule 23(b)(3)*

Even if plaintiffs could satisfy the threshold requirements of Rule 23(a), the predominance test of Rule 23(b)(3) poses a separate and insurmountable barrier to class certification. Under this provision, a class may not be certified unless "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of controversy." The advisory committee notes for Rule 23 explain that this subdivision "encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Fed.R.Civ.P. 23, Advisory Committee Notes,* 39 F.R.D. 98, 102–103 (1966). Because I find that plaintiffs cannot satisfy the predominance requirement, there is no need to address whether the proposed class could pass the superiority and manageability tests encompassed by subdivision (b)(3).

Plaintiffs address the specter of predominance in a variety of unpersuasive ways. Other than proof regarding the existence of a conspiracy, plaintiffs identify no issues that are common to the entire class. Instead, plaintiffs acknowledge explicitly that their claims cannot be adjudicated on a class-wide basis without "some litigation of separate issues relating to injury in fact, medical causation, and perhaps ... affirmative defenses," but maintain that defendants exaggerate how long it would take to cover this ground. Dkt. # 150 at 25 and 29. For example, plaintiffs insist that cross-examination regarding addiction will take as little as twenty minutes for each class member and that ruling out other possible causes of lung cancer is "not difficult to do." *See id.* at 28 and 31. Plaintiffs attempt to distinguish other cases in which courts have refused to certify statewide tobacco class action lawsuits in similar fashion. *See e.g. Barnes v. American Tobacco Co.,* 161 F.3d 127 (3d Cir.1998); *Castano v. American Tobacco Co.,* 84 F.3d 734 (5th

Cir.1996); *Barreras Ruiz v. American Tobacco Co.*, 180 F.R.D. 194 (D.P.R.1998); *Arch v. American Tobacco Co.*, 175 F.R.D. 469 (E.D.Pa.1997); *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90 (W.D.Mo. 1997). *See also Matter of Rhone–Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir.1995) (decertification of class of AIDS-infected hemophiliacs). Compared to these cases, plaintiffs assert, this proposed class is much smaller, numbering in the hundreds or thousands, not tens of thousands or millions.

■ Even if these assertions are correct, plaintiffs miss the point. Predominance is not a function of how quickly a court can dispose of individual issues or of the ratio of such issues to class size, but "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 2249, 138 L.Ed.2d 689 (1997). Although not categorically excluded by this requirement, mass tort cases are ordinarily inappropriate for class treatment, particularly when they present "significant questions, not only of damages, but of liability and defenses to liability ... affecting individuals in different ways." *Id.*, 117 S.Ct. at 2250 (quoting *Advisory Committee Notes*, 39 F.R.D. at 103). "In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried." *Advisory Committee Notes*, 39 F.R.D. at 103. Curiously enough, this is the very scenario envisioned by plaintiffs: a series of 12–week trials at which the claims of 90 class members would be disposed of one trial at a time until the entire process would end, at least five years and at least 1000 plaintiffs later. *See* Pls.' Br. in Reply, dkt. # 150, at 2–3. This is sheer fantasy. Briefly, I will explain why.

Plaintiffs' proposed class is plagued by individual issues. Causation remains one of the more formidable issues not subject to general proof. *See* Jack B. Weinstein, *Individual Justice in Mass Tort Litigation* 148 (1995) ("The only real liability issue becomes causation: was this manufacturer's product a substantial cause of this plaintiff's medical problems—however we define them?"). To prevail under any of theories raised in plaintiffs' complaint, individual class members must prove that a causal link exists between their injury (lung cancer) and their use of defendants' products (cigarettes). *See* Richard A. Nagareda, *In the Aftermath of the Mass Tort Class Action*, 85 Geo.L.J. 295, 317 n. 100 (1996) ("In contrast to the variations in state tort law on other questions, there is no reason to believe that any jurisdiction deviates from the requirement that the plaintiff demonstrate general causation."). In Wisconsin, causation is an element of a claim for strict liability and negligence; under either theory, a defendant's defective product or negligent conduct was a "substantial factor" in producing a plaintiff's injury. *See Glassey v. Continental Insurance Co.*, 176 Wis.2d 587, 599, 500 N.W.2d 295, 300 (1993) (strict liability); *Miller v. Wal–Mart Stores, Inc.*, 219 Wis.2d 250, 262–263, 580 N.W.2d 233, 238 (1998) (negligence). Aside from general causation, issues such as reliance, addiction and contributory negligence all depend to some extent on facts specific to individual plaintiffs, not the entire class. Given all of these obstacles, it is no wonder that plaintiffs envision at least half a decade of nonstop litigation. If anything, this forecast appears rather optimistic.

At the same time that plaintiffs acknowledge the existence of certain individual issues central to the merits of their claims, they propose two novel methods of resolving these issues on a class-wide basis. First, plaintiffs insist that causation, reliance, consent, addiction and comparative negligence are controlled by "essentially the same body of proof" because each issue turns on "what the class of Plaintiffs knew and did not know" and "whether Plaintiffs' freedom of choice was impaired by their cigarette smoking." Dkt. # 150 at 29–30. Going even one step further, plaintiffs argue that the fact of class membership itself will be dispositive of causation for class members. *See id.* at 29 ("given the enormous prevalence of cigarette smoking as the cause of so many cases of lung cancer, and the class-defined requirements for smoking history, there would be at the most a small number of cases with a genuine dispute on the issues of causation requiring trial by jury."). In other words, many of the individual issues implicated in this lawsuit are capable of being resolved either through the wholesale attribution of

generic knowledge to class members or by using elements of the claims to define the class. Plaintiffs cite no authority for either of these propositions. Indeed, the law is to the contrary.

■ A class may not be defined on the basis of the state of mind of individual class members or on the merits. *See Manual for Complex Litigation* § 30.14 (3d ed.1995); *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981). Normally, these are threshold considerations discussed in the context of Rule 23's implicit requirement that the definition of a proposed class must be precise, objective and presently ascertainable, *see Manual for Complex Litigation* § 30.14, but they apply with equal force to the predominance inquiry. Both requirements are animated by the same objectives. Preliminary identification of the class allows the court to "decide whether the class device simply would be an inefficient way of trying the lawsuit—for the parties as well as for its own congested docket." *Simer*, 661 F.2d at 670. Similarly, "the predominance test asks whether a class suit . . . is economical and efficient in the context of all issues in the suit." 1 Newberg and Conte, at § 4.25. Issues not subject to common proof must be resolved on the basis of facts specific to individual class members. It makes no difference whether these issues are part of the definition of a proposed class or part of the merits of the claims raised in a complaint. As observed by the Seventh Circuit in *Simer*, this process takes time. Plaintiffs cannot shortcut it by using otherwise legitimate characteristics to identify class members and then asserting that all such individuals, by virtue of possessing these characteristics, are relieved from offering any specific proof on matters critical to the disposition of their claims. Put another way, plaintiffs could not define their proposed class as all Wisconsin residents with an impaired freedom of choice, with lung cancer caused by smoking and with the same awareness of the health risks of smoking. But this is exactly what plaintiffs are doing here, only dressed up in a different fashion.

## ORDER

IT IS ORDERED that:

1. The motion of defendants Brown & Williamson Tobacco Corporation, Philip Morris Incorporated, R.J. Reynolds Tobacco Company, Lorillard Tobacco Company, The Tobacco Institute, Inc. and The Council for Tobacco Research to file a surreply brief in opposition to plaintiffs' motion for class certification is DENIED; and

2. The motion for class certification of plaintiffs Vincent and Karen Insolia, Billy and Phyllis May, Maureen and Lee Lovejoy and Charles Caldwell, Sr. is DENIED.