**Vincent INSOLIA and Karen Insolia, Billy Mays and Phyllis Mays, Maureen Lovejoy and Lee Lovejoy, Physicians Plus Insurance Corporation, party joined pursuant to Wis.Stat. sec. 803.03, Plaintiffs,**

v.

**PHILIP MORRIS INCORPORATED; R.J. Reynolds Tobacco Company; Brown & Williamson Tobacco Corporation; Lorillard Tobacco Company; Liggett Group Inc.; The Council for Tobacco Research—U.S.A., Inc.; and The Tobacco Institute, Inc., Defendants.**

**No. 97–C–0347–C.**

United States District Court, W.D. Wisconsin.

May 19, 1999.

James A. Olson, Lawton & Cates, S.C., Madison, WI, for Insolia, Vincent, Insolia, Karen.

Thomas J. Basting, Sr., Brennan, Steil, Basting & MacDougall, Janesville, WI, for State of Wisconsin.

Richard Schmidt, Boardman, Suhr, Curry & Field, Madison, WI, for Physicians Plus Ins. (Invol Plaintiff).

Michael T. Graham, Jackson, Lewis, Schnitzler and Krupman, Chicago, IL, for Associates' Health and Welfare.

Mullen J. Dowdal, Asst U.S. Attorney, Madison, WI, for Shalala, Donna.

Michael L. Zaleski, Quarles & Brady, Madison, WI, for Philip Morris Incorporated.

James Clark, Foley & Lardner, Milwaukee, WI, for R.J. Reynolds Tobacco Company.

Timothy J. Pike, Peterson, Johnson & Murray S.C., Milwaukee, WI, for Brown & Williamson Tobacco Corp.

Ralph A. Weber, Reinhart, Boerner, Van Deuren Norris & Rieselbach, S.C., Milwaukee, WI, for B.A.T. Industries P.L.C.

Bruce A. Schultz, Coyne, Niess, Schultz, et al., Madison, WI, for Lorillard Tobacco Company.

Robert B. Raschke, Lindquist & Vennum, Minneapolis, MN, for Liggett Group Inc.

James F. Gebhart, Attorney at Law, Madison, WI, for Hill & Knowlton, Inc.

John H. Schmid, Axley Brynelson, Madison, WI, for The Council for Tobacco Research.

John Koeppl, Attorney at Law, Madison, WI, for The Tobacco Institute, Inc.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for money damages brought by three former smokers and their spouses against the country's major cigarette manufacturers and two tobacco industry trade organizations. The centerpiece of plaintiffs' complaint is an omnibus conspiracy allegation, charging that defendants have engaged in a variety of tortious conduct aimed at recruiting new smokers and insuring that current smokers remain hooked. In addition, plaintiffs have brought stand-alone claims for negligence, strict liability and intentional exposure to a hazardous substance. In light of the number of individual bases of recovery grouped within these broad theories of liability, plaintiffs' claims are best presented in a table:

| *Theory of Liability* | *Individual Claim* |
|---|---|
| Negligence | • Manufacture<br>• Marketing<br>• Warnings regarding addiction and health risks |
| Strict Liability | • Design<br>• Manufacture<br>• Marketing |
| Intentional Exposure to a Hazardous Substance | Manipulation of nicotine and cigar |
| Conspiracy | • Restraint and suppression of research regarding the health risks of smoking<br>• Intentional misrepresentation of health risks and addiction<br>• Fraudulent concealment of health risks and addiction<br>• Manipulation of nicotine and cigarette additives and concealment of manipulation<br>• Negligence<br>• Negligent failure to warn<br>• Strict liability |

The case is before the court on nine separate motions for summary judgment filed by defendants. Again, a table is useful:

| Docket # | Brought By | Against | Claims |
|---|---|---|---|
| 1. 223 | All defendants | Insolia | All claims |
| 2. 226 | All defendants | All plaintiffs | • Intentional exposure to a hazardous substance<br>• Conspiracy to commit negligence<br>• Conspiracy to commit strict liability<br>• Negligent manufacture<br>• Negligent marketing |
| 3. 229 | All defendants | Mays | All claims |
| 4. 232 | All defendants | All plaintiffs | • Negligent manufacture<br>• Negligent marketing<br>• Strict liability: design, manufacture and marketing<br>• Conspiracy to commit strict liability |
| 5. 238 | Brown & Williamson, | Lovejoy and Mays | All claims |
| 6. 241 | All defendants | All plaintiffs | • Conspiracy to intentionally misrepresent risks of smoking and addiction<br>• Conspiracy to fraudulently conceal risks of smoking and addiction<br>• Conspiracy to suppress research regarding risks of smoking and addiction<br>• Conspiracy to fail to warn<br>• Negligent failure to warn<br>• Negligent marketing |
| 7. 244 | All defendants | All plaintiffs | • Negligent failure to warn<br>• Conspiracy to fail to warn<br>• Conspiracy to commit fraudulent concealment<br>• All other claims based on duty to disclose information |
| 8. 247 | Tobacco Institute | All plaintiffs | All claims |
| 9. 251 | Council for Tobacco Research | All plaintiffs | All claims |

(Although the captions of the motions brought by all defendants indicate that defendant Liggett Group, Inc. has not joined in these motions, Liggett has since elected to do so (dkt # 255)). The second, fourth and sixth motions target nearly all of the claims raised by plaintiffs. I con-

clude that these three motions will be granted in most respects. Defendants are entitled to summary judgment on plaintiffs' claims of strict liability, negligent manufacture, negligent marketing, conspiracy to commit negligence and conspiracy to commit strict liability. These claims all hinge on proof that cigarettes are an unreasonably dangerous and defective product. Plaintiffs have failed to come forward with sufficient proof to create a genuine dispute of fact on this issue. Because there is also no proof that plaintiffs relied on any statement made by defendants and no proof that any information concealed by defendants played a material role in plaintiffs' decisions to continue smoking, summary judgment is warranted with respect to plaintiffs' claims that defendants conspired to suppress research, commit intentional misrepresentation and commit fraudulent concealment. Similarly, plaintiffs cannot establish that a causal connection exists between their decisions to continue smoking and defendants' alleged failure to disclose information about the risks associated with smoking when there is no evidence that any type of warning would have made a difference. Without proof of legal causation, defendants are entitled to summary judgment on plaintiffs' negligent failure to warn claims. Finally, summary judgment will be granted on plaintiffs' claim of intentional exposure to a hazardous substance. No such cause of action exists in Wisconsin and this court does not have the authority to create one unilaterally.

This leaves plaintiffs' claim that defendants have conspired to manipulate the nicotine content of cigarettes and to conceal such manipulation. I am unable to find any direct reference to this allegation in any of the briefs submitted by defendants. Arguably, this claim could be grouped with plaintiffs' misrepresentation claims. If this was defendants' intention, I do not believe that their brief put plaintiffs on notice of it. Defendants will have two weeks within which to inform the court whether they intend to move for summary judgment on plaintiffs' remaining claim. A decision on all other motions filed by all other defendants will be stayed pending resolution of this matter.

On a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997). For the purpose of deciding defendants' motions for summary judgment, I find from the parties' proposed findings of fact that there is no genuine dispute with respect to the following material facts.

## UNDISPUTED FACTS

### A. *Individual Plaintiffs*

#### 1. *Maureen Lovejoy*

Plaintiff Maureen Lovejoy began smoking in 1953. She quit in 1996 after her husband was diagnosed with a heart ailment. From 1960 to 1996, Maureen Lovejoy smoked two packs of cigarettes a day. During the same period, she tried unsuccessfully to quit smoking on eight separate occasions. Lovejoy never saw any statement from any defendant about smoking and health that she relied on in making any decision about smoking.

Sometime in the late 1950s or early 1960s, one of her friends attributed the loss of his lung to smoking. This came as a surprise to Lovejoy and her husband. On almost every occasion on which Lovejoy visited her physician over a 15–20 year period, he advised her to quit smoking. Her physician did not provide a specific reason; he said simply that smoking was bad for her health. Lovejoy had heard for years that smoking caused cancer and pulmonary disease. She had read the warning labels on cigarette packages. At some point, Lovejoy switched to low tar cigarettes because "they didn't seem to take the life out of you as much as the regular

ones. They're easier on you." Dep. of Maureen Lovejoy, 7/16/1998, dkt. # 130, at 43.

#### 2. *Vincent Insolia*

Plaintiff Vincent Insolia began smoking in 1935. For approximately 40 years, Insolia smoked three packages of cigarettes a day. He was aware of reports that linked smoking to adverse health consequences. Also, his wife's parents had both died of lung cancer. Insolia had heard cigarettes referred to as "cancer sticks." The characterization did not mean much to him because "the tobacco company said it wasn't bothering me, so I didn't pay any attention to warnings. Before there was never no warnings. Here I smoked all these years, never been warned about it." Dep. of Vincent Insolia, 10/30/1997, dkt. # 128, at 57. Despite Insolia's awareness of the risks associated with smoking, he continued to smoke because he was unable to stop. Insolia managed to quit in 1974 after he began suffering from terrible headaches and coughing, which he attributed to smoking.

Insolia never saw any statement from any defendant about smoking and health that he relied on in making any decision about smoking.

#### 3. *Billy Mays*

Plaintiff Billy Mays began smoking in 1952 and quit in 1994. Since 1957, Mays had smoked two packages of cigarettes a day. In 1995, he was diagnosed with lung cancer. While serving in the military in the early to mid–1960s, Mays was exposed to Army-sponsored smoking cessation programs that promoted the health benefits of quitting. Starting sometime in the 1950s, Mays made numerous unsuccessful attempts to quit smoking through many different methods. In place of stopping entirely, Mays switched to filtered and low tar cigarettes because he considered them less harmful. Finally, in 1994, Mays was able to quit with the assistance of nicotine patch treatment that he received as part of a special Veterans' Administration program.

Around 1963, Mays's doctor advised him that smoking could be bad for his asthma. He received similar advice on many other occasions from other doctors. Mays knew about the warnings on cigarette packages and understood these warnings. He cannot recall any specific statement by any specific defendant about smoking and health. However, Mays remembers being confused by the tobacco industry's denials of government claims regarding the risks associated with smoking. Mays cannot recall ever seeing any advertisement that made any explicit claims about smoking and health but he does remember advertisements that showed people having a good time enjoying smoking. Mays did not need the tobacco industry to tell him that smoking was bad for his health; he had known this himself as early as 1960.

#### B. *Consumer Knowledge*

Awareness of evidence regarding smoking and disease and the habit-forming nature of smoking has been part of American culture throughout the twentieth century. This evidence has been transmitted to the general public through popular media sources such as magazines, radio and television. For example, in 1924, 1950 and 1954, *Reader's Digest* ran articles exploring the health risks associated with smoking. *Time* and *Newsweek* published similar articles as early as 1934. In a 1952 Disney cartoon called "No Smoking," the character Goofy begins to smoke but later renounces cigarettes after developing a smoker's cough. The effects of smoking are described lyrically in Tex Williams' 1946 ditty, "Smoke, Smoke, Smoke That Cigarette." The difficulties of quitting are portrayed in the 1942 film "Saboteur." A 1954 Gallup poll revealed that 89.9% of a national sample had heard or read about the connection between smoking and cancer. A 1960 poll of junior and senior high school students from across the United States found that 97.4% of those polled believed that such a connection existed.

Using these same channels of communication, defendants have denied repeatedly that smoking is dangerous. Some tobacco industry advertisements portrayed smoking as healthy and implied that filtered and low-tar cigarettes were healthier than regular ones.

## OPINION

### A. *Products Liability*

At the outset, I note that there is a dispute whether the court should apply Wisconsin or Illinois law to the products liability claims brought by the Insolias. This dispute is significant only in the context of the parties' arguments regarding the state statutes of limitations and repose. Because I will resolve these claims on other grounds and because the parties agree that there is no significant distinction between the standards for products liability actions applied by Wisconsin and Illinois courts, I will apply Wisconsin law.

In Wisconsin, products liability claims fall into three categories: breach of warranty, negligence and strict liability. *See* Wis JI—Civil 3200. Plaintiffs are proceeding under the latter two theories. According to defendants, plaintiffs cannot succeed on a negligence or strict liability claim unless they can establish that cigarettes are a dangerous and defective product. Defendants derive this standard from the *Restatement (Second) of Torts*, § 402A, which addresses strict products liability. In support of the proposition that § 402A applies to claims based on negligence as well as strict liability, defendants rely on *Vincer v. Esther Williams All–Aluminum Swimming Pool Co.*, 69 Wis.2d 326, 330, 230 N.W.2d 794, 797 (1975), in which the Supreme Court of Wisconsin stated: "even under negligence law, the plaintiff must still prove that the product causing the injury was dangerous and defective." Defendants fail to mention that the court withdrew this broad statement only one year after *Vincer. See Howes v. Deere & Co.*, 71 Wis.2d 268, 274, 238 N.W.2d 76, 80 (1976). In *Howes*, the court acknowledged that some doctrinal confusion existed in this area of products liability law and sought to rectify it by explaining what it saw as the distinctions between the concepts of strict liability, negligence per se and ordinary negligence. This confusion is attributable to *Dippel v. Sciano*, 37 Wis.2d 443, 459, 155 N.W.2d 55, 63 (1967), in which the state supreme court first adopted § 402A but characterized the basis for recovery under this section of the restatement as "negligence per se," not as strict liability. *See Hansen v. Cessna Aircraft Co.*, 578 F.2d 679, 682 (1978) (citing *Dippel*, 37 Wis.2d at 461, 155 N.W.2d at 64 (strict liability "akin to negligence per se")). Whereas strict liability focuses on whether the product in question is defective without regard to the defendant's conduct, "when the claim is based upon negligence, it is necessary to prove what the seller or manufacturer did or did not do . . . . [I]f such proof demonstrated a defective condition unreasonably dangerous to the user or consumer, the product might well fall within the negligence per se doctrine of *Dippel*." *Howes*, 71 Wis.2d at 275, 238 N.W.2d at 80; *see also Gracyalny v. Westinghouse Elec. Corp.*, 723 F.2d 1311, 1317 (7th Cir.1983).

■ The purpose of this digression is to emphasize that plaintiffs' negligence claims are not controlled by the "dangerous and defective" standard from § 402A unless these claims fit within the negligence per se category delineated in *Howes*. Determining where plaintiffs' claims fit is not as easy as one might think. Defendants have expressed some confusion regarding the exact nature of plaintiffs' negligence claims and I share this confusion. In particular, defendants wonder what plaintiffs mean by the contention that defendants have negligently manufactured and marketed cigarettes. Plaintiffs have offered the following rejoinder: "Whether the allegations are construed to be negligence in design, construction or marketing, the fundamental basis for the claim is that the defen-

dants continued to sell cigarettes to persons when they were reasonably aware that these products were highly addictive drug delivery devices and caused lung cancer." Pls.' Br. in Opp., dkt. # 260, at 43. This passage reveals that plaintiffs' "negligent manufacture" and "negligent marketing" claims are something of a hybrid. They incorporate the foundation of plaintiffs' strict liability claim, namely, that cigarettes are unreasonably dangerous and defective because they are addictive and because they cause lung cancer. *See id.* at 26. By focusing on defendants' conduct, these allegations also incorporate an element of an ordinary negligence claim: that defendants breached a duty of care owed to plaintiffs by making and selling an unreasonably dangerous and defective product. According to the state supreme court's analysis in *Howes,* 71 Wis.2d 268, 238 N.W.2d 76, this places plaintiffs' negligent manufacture and negligent marketing claims squarely within the negligence per se category, making it necessary for plaintiffs to prove that cigarettes are dangerous and defective within the meaning of § 402A.

▮ To make such a showing, plaintiffs must prove that cigarettes are "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases [them], with the ordinary knowledge common to the community as to [the] characteristics [of cigarettes]." *Vincer,* 69 Wis.2d at 331, 230 N.W.2d at 798 (quoting *Restatement (Second) of Torts* § 402A). Put another way: "If the average consumer would reasonably anticipate the dangerous condition of the product and fully appreciate the attendant risk of injury, [the product] would not be unreasonably dangerous and defective." *Id.* at 332, 230 N.W.2d at 798. As emphasized by the state supreme court, the so-called "consumer contemplation" test is an objective inquiry; it "is not dependent upon the knowledge of the particular injured consumer...." *Id.* This is a crucial point.

For obvious reasons, an objective standard that makes no allowances for age or maturity is ill-adapted to plaintiffs Vincent Insolia, Billy Mays and Maureen Lovejoy, all of whom began smoking as minors. It is a safe assumption that like other children their age, these plaintiffs could not anticipate danger or appreciate risk as well as the "average" consumer·when they began to smoke in their early teens. The Court of Appeals for the Seventh Circuit has commented on this anomaly:

> Reason dictates that children are not ordinary consumers under the consumer contemplation test. Unlike ordinary consumers, children lack knowledge common to the community regarding consumer products. This lack of knowledge makes children particularly unfit subjects for any test meant to measure expectations.
>
> \* \* \* \* \* \*
>
> Nor do children perceive the dangers inherent in just about any product. We all had the experience as children of putting a hand on a hot pot or stove. Recall the story about the unfortunate child who expected his Superman cape to allow him to fly. Children engage in these dangerous activities because, in their limited experience, they cannot comprehend the possibility of injury.

*Todd v. Societe Bic, S.A.,* 21 F.3d 1402, 1408 (7th Cir.1994) (en banc) (applying Illinois law). Out of concern for the "non-average" consumer who is unable to appreciate risk, some commentators support an alternative standard that would shift the axis of inquiry from the average consumer to the "foreseeable consumer." *See id.* Whatever . benefits this new standard might provide to plaintiffs or others like them, a federal court is in no position to make such a change in state law. "Any reformulation of the consumer contemplation test which requires a court or jury to assess liability based on a child's product expectations, removes well-designed limitations from Section 402A in all cases where a child is injured. Under such a

test, manufacturers would face absolute liability every time a child was injured by a product." *Id. See Dippel,* 37 Wis.2d at 459–460, 155 N.W.2d at 63 (strict liability should not be confused with absolute liability).

On the understanding that the danger posed by cigarettes must be examined from the perspective of an average *adult* consumer, I turn to the merits of defendants' motion. According to plaintiffs, the cigarettes manufactured by defendants are defective because the average consumer did not appreciate 1) the health risks associated with smoking; or 2) the addictive nature of nicotine. Plaintiffs place the most emphasis on the later theory. This strategy is not surprising in light of the number of courts that have rejected the notion that the ill-health effects of smoking render cigarettes defective under the consumer contemplation standard. *See, e.g., Allgood v. R.J. Reynolds Tobacco Co.,* 80 F.3d 168, 172 (5th Cir.1996) ("dangers of cigarette smoking have long been known to the community"); *Roysdon v. R.J. Reynolds Tobacco Co.,* 849 F.2d 230, 236 (6th Cir.1988); *Tompkin v. American Brands, Inc.,* 10 F.Supp.2d 895, 905 (N.D.Ohio 1998); *Paugh v. R.J. Reynolds Tobacco Co.,* 834 F.Supp. 228, 231 (N.D.Ohio 1993); *The American Tobacco Company, Inc. v. Grinnell,* 951 S.W.2d 420, 429 (Tex.1997). By contrast, at least one court has allowed a tobacco products liability claim to go to a jury under an "addiction-as-defect" theory. *See Grinnell,* 951 S.W.2d at 429–431 (issue of fact existed regarding awareness of addiction under consumer contemplation test). Other courts have simply acknowledged the viability of such a claim without examining whether enough evidence had been produced to sustain it. *See Rogers v. R.J. Reynolds Tobacco Co.,* 557 N.E.2d 1045, 1054 (Ind.App.1990) (no basis for judicially noticing ordinary consumer's knowledge of addictive qualities of cigarettes may have been in 1940); *Burton v. R.J. Reynolds Tobacco Co.,* 884 F.Supp. 1515 (D.Kan. 1995) (same) (citing *Rogers* ); *State of Tex-*

*as v. American Tobacco Co.,* 14 F.Supp.2d 956, 966 (E.D.Tex.1997) (denying motion to dismiss on addiction-as-defect theory).

■ According to plaintiffs, *Rogers, Burton* and *State of Texas* stand for the proposition that an addiction-as-defect products liability claim should not be dismissed "as a matter of law." Dkt. # 260 at 31. Plaintiffs may be correct but they miss the point. On a motion for summary judgment, parties are held to legal *and* evidentiary burdens. This is where plaintiffs' products liability claims fall wide of the mark: plaintiffs have failed to produce evidence capable of creating a genuine dispute of fact whether the ordinary consumer perceived the risks associated with smoking.

Defendants have proposed as facts the following dispositive conclusions:

4. The popular awareness of evidence regarding smoking and disease and the commonly-termed 'addictive' nature of smoking has been deeply ingrained in American culture throughout the Twentieth Century.

16. The average American has long had the common knowledge of the potential health hazards associated with cigarette smoking and the habit forming nature of cigarettes.

*See* Defs.' Prop. Findings of Fact in Supp. of Mot. for Summ.J. Based on Restatement (Second) of Torts § 402A, dkt. # 236. These facts are supported solely by reference to an expert report submitted by Theodore Wilson, a professor of American history at the University of Kansas. His report addresses "the issue of popular awareness of evidence regarding the addictive nature and health-threatening effects of cigarette smoking in Wisconsin and the United States during the 20th century." Dkt. # 235, at 2.

The evidence to the contrary adduced by plaintiffs consists mainly of industry documents, scientific studies on smoking and health and an expert report submitted by

Richard Pollay, a professor of marketing at the University of British Columbia. Plaintiffs attempt to create a dispute of fact in two ways. First, plaintiffs acknowledge that information about the adverse health effects of smoking has been available to consumers through a variety of sources for many years but cite the Pollay report for the proposition that this beneficial information has been "effectively nullified" by tobacco industry advertising and propaganda. *See* Pls.' Resp. to Defs.' Prop. Findings of Fact, dkt. # 266, at ¶ 4. Second, plaintiffs use the report to build an argument that turns on the distinction between "habit" and "addiction." As explained by plaintiffs, "the average American has been led to believe that cigarettes are merely 'habit-forming' as opposed to 'addictive,' and has not understood cigarettes as highly addictive drug delivery devices." *See id.* at ¶ 16. Plaintiffs' effort fails because Professor Pollay's report is not admissible as evidence of either these propositions.

■ It is well settled that affidavits of expert witnesses cannot contain mere conclusory statements of their ultimate opinions; the affidavits must reveal "a process of reasoning beginning with a firm foundation." *See Mid–State Fertilizer v. Exchange Nat. Bank,* 877 F.2d 1333, 1338–39 (7th Cir.1989). In some respects, the requisite foundation and process of reasoning are discernible in the Pollay report. For example, Professor Pollay illustrates persuasively how the tobacco industry developed advertising campaigns that targeted women and children as well as promoted smoking as a habit in which healthy, successful, attractive people engaged. That said, the report suffers from a lack of depth and focus. It is apparent that Professor Pollay did not tailor the report to the dispositive questions presented by this motion. At best, consumer knowledge is addressed in either a tangential or wholly conclusory fashion. Professor Pollay's observations about the way in which the tobacco industry has crafted advertisements

to appeal to certain groups, the misrepresentations contained in these advertisements and the amount of money the industry has spent on them are nothing more than a starting point for explaining why consumers *might not* appreciate the risks associated with smoking. However, the report does not back up the unsupported conclusions that proceed from this hypothesis with any hard evidence on the effectiveness of the industry's strategies. All of these conclusions appear in the first two pages of the section of the report entitled "Advertising Impact and Opinion." They include:

- The industry advertising and advocacy countermined all sources of health warnings. The result was that although many people have heard about health hazards, a minority gives credence to them.

- The public consistently underrates the hazards [associated with smoking] and is materially unaware of many specific risks.

- The public has a general idea that "smoking is dangerous" but ... [t]he level of danger is not widely comprehended, and was not widely comprehended in the past.

- Public opinion on cigarette smoking has been affected by the press, the public advocacy of cigarette companies, the federally-required cautionary labels after 1966, among other things. The public has been deceived by the cigarette companies, who have repeatedly denied that cigarettes are dangerous and addictive.

Aff. of Richard Pollay, dkt. # 274, at 7–8. One would expect these sweeping assertions to be accompanied by citations to public opinion surveys, anthropological, market or sociological studies—in short, *anything* that would demonstrate the actual impact of tobacco industry advertising on the ordinary consumer. Instead, Professor Pollay merely presents a hypothetical cause and asks the court to assume an effect. To paraphrase the Seventh Cir-

cuit: no professor of marketing would put such unsupported assertions in a scholarly article; Pollay would not accept them in a submission to the *Journal of Marketing,* on whose editorial board he served for ten years; I doubt that he would accept them in a term paper submitted by a student. *See McMahon v. Bunn–O–Matic, Corp.,* 150 F.3d 651, 658 (7th Cir.1998). Aside from not addressing adequately the general issue of consumer knowledge, Professor Pollay has failed to situate his analysis of the issue in an appropriate historical context. Vincent Insolia smoked from 1935 to 1973 or 1974; Billy Mays smoked from 1951 to 1994; and Maureen Lovejoy smoked from 1953 to 1996. During these periods, the state of consumer knowledge regarding the risks associated with smoking did not remain in stasis despite the impression left by Professor Pollay's treatment of the issue.

The other evidence on which plaintiffs rely fares no better. For the most part, this evidence consists of two articles from the Journal of the American Medical Association, a 1969 Congressional report by the Federal Trade Commission and the reports on smoking and health produced by Surgeon General's office over the past three decades. Defendants are correct that almost all of these documents are inadmissible hearsay because they have not been relied on by plaintiffs' expert witness. But the real problem with this evidence is relevance, not admissibility. Plaintiffs string together passages from these documents to support the following propositions: 1) the 1964 Surgeon General's Report characterized smoking as a habit, not an addiction; 2) "the general public health community did not begin to recognize nicotine as an addictive drug until 1980"; and 3) "the public health community" did not reach a consensus on addiction until 1988, when a report published that year by the Surgeon General's Office reclassified nicotine as an addictive drug. *See* Pls.' Br. in Opp. to Defs.' Mos. for Summ. J., dkt. # 260, at 30. Relying on essentially the same assertions and the same underlying evidence, the Texas Supreme Court reached the conclusion that plaintiffs urge here: a jury should decide whether the ordinary consumer appreciated the addictive nature of nicotine before the 1988 Surgeon General report. *See Grinnell,* 951 S.W.2d at 429–431. One of the dissenting justices in this case articulated what I see as the fundamental problem with plaintiffs' argument: just as an "ordinary" consumer does not perceive risks in the way that a child does, this same hypothetical individual would not be preoccupied with an esoteric debate confined, so far as plaintiffs have shown, to medical journals. As Justice Hecht explained in his dissent in *Grinnell:*

> The distinction between addiction and habituation, important in scientific contexts, is unimportant for purposes of comment i [of Restatement § 402A]. The two ideas mean only one thing to smokers: it's hard to quit. This is not a new discovery, suddenly revealed by the Surgeon General in a 1988 report. Almost anyone who ever smoked for any length of time and tried to stop has found it hard; many have found it impossible. Few understood why, in terms of psychological and biochemical body processes, but the difficulty was surely no less real merely because it could not fully be explained.

*Id.* at 441 (Hecht, J., concurring in part and dissenting in part). Plaintiffs do not dispute the fact proposed by defendants that the "average American has long had the common knowledge of ... the habit forming nature of nicotine." *See* dkt. # 236 at ¶ 16. Instead, plaintiffs reiterate the differences between habit and addiction without demonstrating persuasively how this scientific distinction is probative of the *ordinary* consumer's knowledge regarding smoking.

At this juncture, it should be emphasized again that on a motion for summary judgment, "after the movant has articulated with references to the record and to the law specific reasons why it believes there

is no genuine issue of material fact, ... the nonmovant [must] present evidence sufficient to demonstrate an issue for trial." *Logan v. Commercial Union Insurance Co.*, 96 F.3d 971, 979 (7th Cir.1996) (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548). Even when inferences are drawn in plaintiffs' favor, I cannot say that they have carried their burden with respect to the consumer contemplation element of their products liability claims. Attempts to minimize or do away with this burden are similarly unavailing. For example, plaintiffs suggest that the consumer contemplation test is a function of the question whether cigarettes represent an "open and obvious" danger and cite *Rockweit v. Senecal*, 197 Wis.2d 409, 541 N.W.2d 742 (1995), for the proposition that ordinarily this type of question must be resolved by a jury. I reached the opposite conclusion in *Westlund v. Werner Co.*, 971 F.Supp. 1277, 1281 (W.D.Wis.1997). Acknowledging that some ambiguity existed, I predicted that "Wisconsin courts following the *Rockweit* decision would consider the open and obvious danger doctrine in [manufacturer-consumer cases] to be part of the contributory negligence analysis just as it is in ordinary negligence cases." *Id.* at 1281. I explained that "a plaintiff's confrontation of an open and obvious danger is merely an element to be considered by the jury in apportioning negligence under Wisconsin's comparative negligence law, Wis.Stat. § 895.045." *Id.*

■ Another way in which plaintiffs attempt to avoid their evidentiary burden is by suggesting that defendants' well-documented history of vigorous denials that smoking is harmful or addictive should either preclude them from taking the opposite position in this case or create an issue of fact on consumer contemplation. I agree that defendants' position reeks of irony but do not see how it justifies invoking the doctrine of judicial estoppel, as plaintiffs insist that it does. Judicial estoppel is intended to prevent a litigant from playing fast and loose with the courts. *See Harrison v. Labor & Industry Review Commission*, 187 Wis.2d 491, 497, 523 N.W.2d 138, 140 (Ct.App.1994). It is applicable only to inconsistent positions advanced by the same party in subsequent judicial proceedings and only after one of the positions has been adopted by a court or administrative agency in the first proceeding. *See id.* The prior statements highlighted by plaintiffs are tobacco industry advertising and advocacy; defendants did not make these statements in the context of a judicial proceeding. Plaintiffs have not cited a case in which any of the defendants has asserted that the ordinary consumer does not appreciate the health risks associated with smoking or the danger of nicotine addiction. However, plaintiffs observe that in Wisconsin judicial estoppel operates similarly to a related doctrine known as "mend the hold." Like judicial estoppel, mend the hold prevents a party from repudiating a position taken during the course of a lawsuit. *See Horwitz–Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1251 (7th Cir.1996). Although Wisconsin does not recognize the mend the hold doctrine, Wisconsin courts have invoked judicial estoppel to prevent a party from taking inconsistent positions in the same legal proceeding. *See, e.g., Management Computer Services v. Hawkins, Ash, Baptie & Co.*, 196 Wis.2d 578, 614–15, 539 N.W.2d 111, 126 (Ct.App.1995), *aff'd in part and rev'd in part on other grounds*, 206 Wis.2d 158, 557 N.W.2d 67 (1996). Emphasizing this point, plaintiffs note that in this lawsuit defendants have denied that cigarettes are addictive and that smoking causes lung cancer. On the basis of these denials, plaintiffs argue, defendants should be estopped from asserting that consumers have appreciated the risks associated with smoking. The major problem with plaintiffs' argument is that defendants' positions on addiction and causation are distinct from what the average consumer thinks about these issues. Finally, there is no merit to plaintiffs' contention that a dispute of fact is created

by defendants' past and current denials regarding the danger and addictiveness of cigarettes. This is nothing more than a restatement of plaintiffs' argument that tobacco industry advertising and advocacy have distorted the average consumer's appreciation of the risks associated with smoking. As already indicated, this is a plausible theory of liability but not one that is backed up with the necessary evidence.

### B. Conspiracy to Commit Misrepresentation, Conspiracy to Commit Fraudulent Concealment, and Negligent Failure to Warn

 Defendants contend that they are entitled to summary judgment on plaintiffs' claims of conspiracy to commit misrepresentation and conspiracy to commit fraudulent concealment because plaintiffs have produced no evidence to support the elements of reliance or causation. (The additional allegation that defendants have conspired to suppress research regarding the health risks of smoking appears to be nothing more than another iteration of plaintiffs' fraudulent concealment claim.) Defendants place particular emphasis on plaintiffs' concession that they can recall no specific representation made by any of the defendants, whether false or otherwise. As a result, defendants maintain, plaintiffs' negligent failure to warn claim is also deficient because plaintiffs cannot establish causation without proof of reliance.

Plaintiffs agree with the basic premises underlying defendants' argument: the conspiracy claims require proof of causation and reliance and the negligence claims require proof of legal causation. These propositions are supported by Wisconsin case law. *See Kimberly Area School District v. Zdanovec,* 222 Wis.2d 27, 52–53, 586 N.W.2d 41, 51 (Ct.App.1998) (all actions for misrepresentation require showing that plaintiff relied on alleged misrepresentation); *Ollerman v. O'Rourke Co., Inc.,* 94 Wis.2d 17, 26–27, 288 N.W.2d 95, 99–100 (1980) (fraudulent concealment is

species of intentional misrepresentation claim in which defendant failed to disclose material fact that defendant had duty to disclose); *Dowd v. City of New Richmond,* 137 Wis.2d 539, 566–567, 405 N.W.2d 66, 77 (1987) (claim of civil conspiracy requires proof of causal nexus between underlying wrongful conduct and damages sought by plaintiff); *See Rockweit,* 197 Wis.2d at 418, 541 N.W.2d at 747 (action for negligence requires proof of legal causation).

Plaintiffs do more than acknowledge that defendants have stated the governing legal principles accurately. In a single sentence, plaintiffs concede that they have produced no evidence on the issue of reliance and then proceed to reformulate the theory behind their misrepresentation claims:

> Defendants are correct that plaintiffs can identify no specific representation upon which they relied; however, the evidence does show that all consumers, including the plaintiffs and the public health authorities, were generally misled concerning these dangers and that the particular plaintiffs in the present case failed to quit smoking sooner as a result of the fraudulent concealment and misrepresentations.

Dkt. # 260, at 51. Defendants make numerous objections to this stratagem, all of which amount to the general criticism that plaintiffs have essentially raised new theories of liability in their brief. Defendants are correct. Before I explain why, it is worth emphasizing that defendants have firmly established the foundation for their motion for summary judgment on what I will refer to as plaintiffs' "original" misrepresentation, fraudulent concealment and negligent failure to warn claims. Specifically, there is no evidence that plaintiffs chose to start or continue smoking in reliance on tobacco industry advertising and advocacy. Neither plaintiff can recall a single statement made by defendants R.J. Reynolds, Philip Morris, Lorillard, Liggett or Brown & Williamson about the health effects of smoking. By contrast, all plain-

tiffs remember hearing throughout their years as smokers warnings from various quarters about the risks associated with cigarettes but have maintained that no amount or type of warning could have persuaded them to stop. These undisputed facts make it is clear why defendants are entitled to summary judgment on both the conspiracy and the negligence claims. As a matter of logic, plaintiffs cannot argue they relied on statements that they never heard. Similarly, plaintiffs' admissions that warnings would have had no impact on their decisions to continue smoking are logically inconsistent with the theory of causation behind their negligence claim, namely, that they continued to smoke because defendants failed to provide more extensive warnings.

The core allegations of plaintiffs' retooled theory of liability are as follows:

- between 1960 and 1980, the "public health community" believed erroneously that cigarettes could not be characterized as "highly addictive drug delivery devices" but merely as a habit-forming product;

- as a result, the public health community did not regard the use of nicotine substitutes and other medications as an effective way of helping someone to stop smoking;

- the public health community formulated these beliefs in reliance on the misrepresentation and concealment practiced by the tobacco industry;

- during this same period, all plaintiffs tried and failed to quit smoking;

- if the tobacco industry had disabused the public health community of its mistaken position on addiction: 1) more effective smoking cessation treatments would have been developed; 2) plaintiffs would have tried them; and 3) plaintiffs' risk of developing lung cancer would have decreased.

Dkt. # 260 at 54–58. In support of this theory, plaintiffs rely on a Wisconsin statute that proscribes fraudulent representa-

tions in advertising, *see* Wis.Stat. § 100.18, but does not appear in plaintiffs' second amended complaint.

■ The turn that these claims have taken violates the well established principle that a "plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir.1996); *see also Andree v. Ashland Co.,* 818 F.2d 1306, 1314 n. 11 (7th Cir.1987) ("A civil plaintiff is barred from injecting new allegations into his or her case by raising them after the defendant has filed a motion for summary judgment, for such a strategy fails to give adequate or fair warning as to the claims the defendant must address and against which it must defend."). Plaintiffs' complaint cannot be construed reasonably to put defendants on notice of a claim grounded in a scheme to defraud the public health community, as opposed to consumers, for the purpose of impeding the development of effective smoking cessation treatment. Indeed, plaintiffs flatly contradict this notion in their complaint, alleging that defendants banded together in 1954 and began disseminating misleading information about the health effects of tobacco "for the purpose of and with the effect that consumer[s] would consider the representations material to their decisions to purchase and use tobacco products." Dkt. # 83 at ¶ 24. There is no mention of what effect, if any, this campaign had on the public health community or the development of smoking cessation treatment. Rather than addressing these subjects in the section of their complaint entitled "Cigarettes and Nicotine Addiction," plaintiffs focus on the number of years that the tobacco industry has regarded nicotine as an addictive drug, the industry's failure to disclose this fact "to the public," and the way in which the industry has manipulated tobacco cultivation and cigarette production to insure that consumers remain addicted. *See id.* at ¶¶ 34–43. These gaps in plaintiffs' complaint are all the more con-

spicuous when one considers that the Federal Rules require parties to plead "the circumstances constituting fraud ... with particularity." Fed.R.Civ.P. 9(b). For all of these reasons, plaintiffs are barred from asserting their newly articulated claim.

### C. Intentional Exposure to a Hazardous Substance

In their second amended complaint, plaintiffs allege that defendants "have intentionally exposed Plaintiffs ... to substances Defendants have known to be hazardous, addictive and toxic substances." Dkt. # 83 at ¶ 56. Defendants assert that they are entitled to summary judgment on this claim because Wisconsin does not recognize a cause of action for intentional exposure to a hazardous substance. Plaintiffs concede that no precedent exists in Wisconsin for a claim styled "intentional exposure to a hazardous substance" and that in this circuit a party "desirous of succeeding on novel state law claims [must] present those claims initially in state court." Birchler v. Gehl Company, 88 F.3d 518, 521 (7th Cir.1996) (quoting Shaw v. Republic Drill Corp., 810 F.2d 149, 150 (7th Cir.1987) (per curiam)). In Shaw, 810 F.2d at 150, the court of appeals explained that this policy against speculation on "trends in state law ... applies with special force to a plaintiff in a diversity case who has chosen to litigate his state law claim in federal court." Plaintiffs maintain that this policy is inapplicable here because they did not chose to litigate any of their claims in this court, but were forced to do so after defendants removed the case from the state court in which plaintiffs filed it originally. As a result, plaintiffs argue, this court should simply "apply Wisconsin law as would the highest court of Wisconsin." Dkt. # 260 at 45. Plaintiffs are correct that district courts confronted with an unclear question of

state law may resolve such a question by inquiring how a state's highest court would rule on the issue. See McGeshick v. Choucair, 72 F.3d 62, 65 (7th Cir.1995). But this does not mean that district courts must "do so in all cases," particularly when actions are "based on novel state law claims." Railway Express Agency v. Super Scale Models, Ltd., 934 F.2d 135, 138 (7th Cir.1991). The tension between these competing principles suggests merely that district courts may not make too large a doctrinal leap on behalf of a state. Shaw suggests that a plaintiff is entitled to more indulgence when her case is removed to federal court by the opposing party. This does not mean, however, that no limits exist in such a circumstance.

There is no dispute that intentional exposure to a hazardous substance represents a novel claim in Wisconsin—just how novel is revealed by plaintiffs' explanation why state courts would be amenable to such a claim. To reach this conclusion, plaintiffs weave together elements of battery and private nuisance but identify no trends in Wisconsin or any other state supporting their approach. Quite the opposite, many of the cases cited by plaintiffs are over a century old; others illustrate the extent to which the concepts of battery and nuisance would have to be manipulated in order to accommodate a claim of intentional exposure. For example, plaintiffs acknowledge that physical force is generally an element of battery and that actions for private nuisance must involve some interest in land. It is not enough to show that these requirements are applied in a flexible manner or to minimize their importance by characterizing them as dicta.[1] In the absence of any clear guidance from Wisconsin courts, it would imprudent to take the kind of liberties with Wisconsin law urged by plaintiffs.

---

1. Plaintiffs maintain that only one Wisconsin court has stated explicitly that physical force is an element of battery, see Vandervelden v. Victoria, 177 Wis.2d 243, 249, 502 N.W.2d 276, 278 (Ct.App.1993), and characterize this

aspect of Vandervelden as mere "dicta." After reviewing this opinion, I fail to see why the recitation of the elements of battery by the court of appeals does not represent an authoritative holding.

ORDER

IT IS ORDERED that:

1. The motion for summary judgment on plaintiffs' claims of (1) intentional exposure to a hazardous substance; (2) conspiracy to commit negligence; (3) conspiracy to commit strict liability; (4) negligent manufacture; and (5) negligent marketing filed by defendants Philip Morris Incorporated, R.J. Reynolds Tobacco Company, Brown & William Tobacco Corporation, Lorillard Tobacco Company, Liggett Group, Inc., The Council for Tobacco Research—U.S.A., Inc. and The Tobacco Institute, Inc. (dkt.# 226) is GRANTED;

2. Defendants' motion for summary judgment based on the Restatement (Second) of Torts 402A (dkt.# 232) is GRANTED;

3. Defendants' motion for summary judgment on plaintiffs' claims for conspiracy, misrepresentation, concealment, failure to warn and negligent marketing (dkt.# 241) is GRANTED;

4. Defendants are ordered to inform the court by June 3, 1999, whether they intend to move for summary judgment on plaintiffs' claim of conspiracy to manipulate the nicotine content of cigarettes and to conceal such manipulation; and

5. A decision on all other motions filed by all other defendants is STAYED pending the disposition of the nicotine manipulation claim.