In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3706

Vera L. Floyd, Floyd Griffin, Jr.,
Curlee Williams, individually and on behalf
of all others similarly situated, et al.,

Plaintiffs-Appellants,

v.

Tommy Thompson, individually and in
his official capacity as Governor of the
State of Wisconsin, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99-C-0268-C--Barbara B. Crabb, Judge.

Argued February 23, 2000--Decided September 19, 2000

Before Flaum, Chief Judge, and Kanne and Diane P. Wood, Circuit Judges.

Diane P. Wood, Circuit Judge. In November 1998, the major tobacco companies and all but four states entered into a settlement agreement, known as the Master Settlement Agreement or the MSA, valued at a whopping $200 billion or so. This case involves the way that Wisconsin's not inconsiderable share of that settlement--some $5.9 billion, to be paid out over the next quarter century--is to be allocated. The plaintiffs, a group of smokers who have received medical assistance payments under Wisconsin's federally supported Medicaid program, believe that both federal and state law require the state to give them a piece of the pie. The district judge concluded that their claims were barred by the Eleventh Amendment and dismissed the action on that ground. While we think it possible that the district court's Eleventh Amendment analysis was correct, the answer is not obvious, and we find it unnecessary to delve into the complexities of that area of law. Instead, both the terms of the MSA and the limited nature of the assignment of claims Wisconsin takes permit us to affirm the district court on that more limited ground.

I

   In order to understand the claims of the Floyd group, which is what we will call these plaintiffs, it is necessary to take a closer look both at the Medicaid reimbursement scheme Wisconsin uses and at the precise nature of the claims that were at stake in the litigation that produced the MSA. We begin with Medicaid.

A.

   Medicaid is the federal program designed to furnish health care services to the indigent. It was established in Title XIX of the Social Security Act, 42 U.S.C. sec.sec. 1396-1396v. As a cooperative federal-state venture, it is administered by an appropriate state agency in virtually every state. That agency in Wisconsin is the Wisconsin Department of Health and Family Services (DHFS), whose secretary Joe Leean is a party to this action, along with Wisconsin Governor Tommy Thompson and Peggy Bartels, the Administrator of the Division of Health Care Financing in DHFS.

   One requirement of the federal Medicaid law is that participants in the program (i.e., persons receiving benefits) must assign any and all claims against third parties who might be responsible for paying their medical expenses to the state Medicaid administrator. The assignment obligation is as follows:

   (a) For the purpose of assisting in the collection of medical support payments and other payments for medical care owed to recipients of medical assistance under the State plan approved under this subchapter, a State plan for medical assistance shall--

   (1)  provide that, as a condition of eligibility for medical assistance under the State plan to an individual who has the legal capacity to execute an assignment for himself, the individual is required--

(A)  to assign the State any rights, of the individual or of any other person who is eligible for medical assistance under this subchapter and on whose behalf the individual has the legal authority to execute an assignment of such rights, to support (specified as support for the purpose of medical care by a court or administrative order) and to payment for medical care from any third party.

42 U.S.C. sec. 1396k. Wisconsin has implemented that federal command through a statute spelling

out a "deemed assignment" system:

As a condition of eligibility for medical assistance, a person shall:

. . .

Notwithstanding other provisions of the statutes, be deemed to have assigned to the state, by applying for or receiving medical assistance, any rights to medical support or other payment of medical expenses from any other person, including rights to unpaid amounts accrued at the time of application for medical assistance as well as any rights to support accruing during the time for which medical assistance is paid.

Wis. Stat. sec. 49.45(19)(a)2.

Both the federal statute and Wisconsin's implementation of it reflect the unsurprising notion that when third parties inflict injuries on Medicaid participants, the program should enjoy a right of subrogation similar to that found in typical private insurance policies. Congress, and then the state, also regulated the distribution of any recovery from a third party in a manner that parallels the usual subrogation rules:

(b) Such part of any amount collected by the State under an assignment made under the provisions of this section shall be retained by the State as is necessary to reimburse it for medical assistance payments made on behalf of an individual with respect to whom such assignment was executed (with appropriate reimbursement of the Federal Government to the extent of its participation in the financing of such medical assistance), and the remainder of such amount collected shall be paid to such individual.

42 U.S.C. sec. 1396k(b). A regulation, 42 C.F.R. sec. 433.154, elaborates further on that statute:

The [state] agency must distribute collections as follows--

(a) To itself, an amount equal to State Medicaid expenditures for the individual on whose right the collection was based.

(b) To the Federal Government, the Federal share of the State Medicaid expenditures, minus any incentive payment made in accordance with sec. 433.153.

(c) To the recipient, any remaining amount. This amount must be treated as income or resources under Part 435 or Part 436 of this

subchapter, as appropriate.

The Floyd plaintiffs claim that the net result of these laws is to require that some portion of the payments Wisconsin is to receive under the MSA go to them. They reason that the fact of their deemed assignment of claims to the state, coupled with the language of the MSA, means that the state resolved their claims in the MSA. The tobacco companies are thus third parties from whom the state has succeeded in collecting money, and the distribution of that money must follow the protocol spelled out in sec. 433.154. In order to evaluate this theory, it is necessary to take a closer look at the litigation that led to the MSA, as well as at the terms of the settlement itself.

B.

At the time the State of Wisconsin commenced its lawsuit against the major tobacco companies (Tobacco) in February 1997, it was well aware that smokers had a very poor track record in trying to hold Tobacco responsible for the myriad health problems to which cigarette smoking and other forms of tobacco use give rise. Tobacco had defeated these claims using a combination of defenses, including preemption, see Cipollone v. Liggett Group, Inc., 505 U.S. 504 (1992); assumption of risk, see, e.g., Barnes v. American Tobacco Co., 161 F.3d 127 (3d Cir. 1998); and lack of reliance, see, e.g., Insolia v. Philip Morris Inc., 53 F. Supp. 2d 1032 (W.D. Wis. 1999). See generally Richard L. Cupp, Jr., A Morality Play's Third Act: Revisiting Addiction, Fraud, and Consumer Choice in "Third Wave" Tobacco Litigation, 46 U. Kan. L. Rev. 465, 466–68 (1998) (discussing plaintiffs' historically poor record in tobacco cases and predicting a change in tide). The last thing the state wanted to do, therefore, was to bring claims that were doomed to fail on exactly these grounds. Compare International Brotherhood of Teamsters v. Philip Morris Inc., 196 F.3d 818, 821 (7th Cir. 1999) (noting that in a subrogation action the insurer must demonstrate both the existence of a tort and the lack of any defenses to liability in the underlying case); see also Health Care Service Corp. v. Brown & Williamson Tobacco Corp., 208 F.3d 579, 581 (7th Cir. 2000) (also reviewing normal requirements for subrogation cases in context of suit by insurer against tobacco companies).

The 1997 litigation therefore took a different tack. The state's complaint accused Tobacco of committing an array of deceitful practices in violation of different state laws. Specifically, it based its claims on the following theories:

Deceptive advertising and fraudulent representations contrary to Wis. Stat. sec. 100.18;

The tort of intentional misrepresentation;

The tort of negligent misrepresentation;

The tort of strict responsibility for misrepresentations;

Anti-competitive conspiracy in restraint of trade contrary to Wisconsin's antitrust laws, Wis. Stat. Ch. 133;

The tort of undertaking of and failure to perform a special duty;

Unjust enrichment;

Restitution;

Public nuisance;

Common law conspiracy and concert of action; and

The Wisconsin Organized Crime Control Act, Wis. Stat. sec.sec. 946.80 et seq.

The complaint sought damages only for direct losses to the state. It asked for a variety of forms of injunctive relief, including a cease-and-desist order against marketing and sales practices appealing to children, public disclosure of research about the connection between smoking and health, public education campaigns, annulment of the defendant companies' corporate charters or authority to do business in Wisconsin, and other controls on their business operations. In addition, it asked for monetary relief, including things like disgorgement of profits resulting from misrepresentations, compensation for pecuniary injuries suffered by the state, restitution and disgorgement for unjust benefits, treble damages for antitrust violations, damages for public nuisance, and punitive damages. Finally, and this is the part on which the Floyd plaintiffs focus, it asked for damages "including but not limited to health care expenditures."

Tobacco initially attempted to have the suit dismissed on grounds similar to those we discussed in the Teamsters case: namely, that this was really a suit pressing the assigned claims of the smokers, and thus was subject to all the defenses Tobacco could raise against them. The state court rejected its arguments, except insofar as they applied to the state's

claims on the counts claiming a special duty, the right to restitution, and the Organized Crime Control Act. It dismissed the latter three counts. See State of Wisconsin v. Phillip Morris Inc., Case No. 97-CV-328 (Circuit Court of Dane County, March 17, 1998). It held that under Wisconsin law subrogation was not the state's exclusive remedy for recovering damages related to Medicaid payments, and it also found that the state's claims were not too remote to pursue.

C.

Obviously, there was never a final judicial resolution of those questions, because Tobacco and the states involved in the settlement (the Settling States) chose to enter into the MSA. There is no doubt that the MSA covered a wide variety of claims. Its definition of "released claims" reads as follows:

(1) for past conduct, acts or omissions (including any damages incurred in the future arising from such past conduct, acts or omissions), those Claims directly or indirectly based on, arising out of or in any way related, in whole or in part, to (A) the use, sale, distribution, manufacture, development, advertising, marketing or health effects of, (B) the exposure to, or (C) research, statements or warnings regarding, Tobacco Products . . . .

(2) for future conduct, acts or omissions, only those monetary Claims directly or indirectly based on, arising out of or in any way related to, in whole or in part, the use of or exposure to Tobacco Products manufactured in the ordinary course of business, including without limitation any future Claims for reimbursement of health care costs allegedly associated with the use of or exposure to Tobacco Products.

MSA para. II(nn).

This language could be read, we agree, as if the states were indeed releasing claims that their public assistance recipients had assigned to them for the recovery of health care expenditures. But it needs to be considered in light of the language of the agreement that describes who is releasing what claims. That section of the agreement provides as follows:

(pp) "Releasing Parties" means each Settling State and any of its past, present and future agents, officials acting in their official capacities, legal representatives, agencies, departments, commissions and divisions; and also means, to the full extent of the power of the signatories hereto to release past, present and

future claims, the following: (1) any Settling State's subdivisions . . . , public entities, public instrumentalities and public educational institutions; and (2) persons or entities acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or any other capacity, whether or not any of them participate in this settlement, (A) to the extent that any such person or entity is seeking relief on behalf of or generally applicable to the general public in such Settling State or the people of the State, as opposed solely to private or individual relief for separate and distinct injuries, or (B) to the extent that any such entity (as opposed to an individual) is seeking recovery of health-care expenses (other than premium or capitation payments for the benefit of present or retired state employees) paid or reimbursed, directly or indirectly, by a Settling State.

MSA para. II(pp). Last, the MSA contains provisions governing the way that the settlement payments will be made to each state. Essentially, it requires payments to be funneled through an escrow agent, who each year transmits the proper amount to each Settling State.

Based on these provisions and the underlying laws, Wisconsin argued to the district court both that any claim the Floyd plaintiffs had to the settlement funds was barred by the Eleventh Amendment and that the MSA in any event did not give rise to any rights on their part under the Medicaid assignment rules because it did not constitute the kind of Medicaid recovery to which those rules applied. For what it is worth, the parties at oral argument directed our attention to a statute indicating that Congress itself may agree with the states on the latter point (or it may just have been feeling generous). Either way, in 42 U.S.C. sec. 1396b(d)(3)(B)(i), it said that the provisions of the Medicaid law requiring reimbursement of the federal government "shall not apply to any amount recovered or paid to a State as part of the comprehensive settlement of November 1998 (i.e. the MSA) between manufacturers of tobacco products [and the states]."

II

Although the district court rested its decision on the Eleventh Amendment, we prefer to rely on the terms of the MSA itself to dispose of the case. The Eleventh Amendment analysis is complex. It would require us to decide, for example, whether the MSA had the effect of immediately vesting the right to the full proceeds to be given the state over the next 25 years in the

state, such that any injunctive order affecting their distribution would impermissibly reach into the state's treasury. It would require us to consider whether the fact that the state's Medicaid payments are made under the broader umbrella of a cooperative grant-in-aid program significantly funded by the federal government, which was enacted under Congress's spending powers, allows federal action with respect to future allocations of the state's funds. Cf. Board of Education v. Kelly E., 207 F.3d 931, 935 (7th Cir. 2000). It would require us to consider whether this is the kind of case in which the doctrine of Ex parte Young, 209 U.S. 123 (1908), permits an injunction against the responsible state officers, or if it is instead the kind of action so fundamentally against the state that a change in caption cannot alter the Eleventh Amendment analysis. See Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261 (1997); compare MCI Telecomm. Corp. v. Illinois Bell Tel. Co., 2000 WL 1010863 (7th Cir. July 24, 2000).

None of those questions is easily answered. The only remaining question is whether we can pass over them, or if the Eleventh Amendment is such a fundamental bar to our power to decide the case that we must reach it first no matter what, just as we must consider federal subject matter jurisdiction before assessing whether a claim has been stated. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 93-94 (1998). The Supreme Court has indicated that the Eleventh Amendment occupies its own unique territory. Unlike basic subject matter jurisdiction, which can never be stipulated or waived, a state is entitled to waive its Eleventh Amendment immunity from suit if it so desires. See College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 666, 675-76 (1999). A court is not required to reach out and decide an Eleventh Amendment issue that has never been raised, see Wisconsin Dept. of Corrections v. Schacht, 524 U.S. 381, 389 (1998), but it is free to consider an Eleventh Amendment defense on its own initiative if it chooses to do so. See Higgins v. Mississippi, 217 F.3d 951, 953-54 (7th Cir. 2000). Finally, as the Court pointed out in Vermont Agency of Natural Resources v. United States, 120 S.Ct. 1858, 1864 (2000), it is permissible to reach the question whether a statute provides for suits against a state before reaching the Eleventh Amendment. Here, we face a very preliminary question about the scope of the MSA. If it appeared in any way possible for these plaintiffs to sue the state under its terms, then Vermont Agency indicates we should resolve the Eleventh Amendment issue first. But we believe it is permissible to make that initial inquiry about the agreement, if that can be done more readily.

Naturally, if the result of that analysis suggests that the state could be sued, it would become necessary to reach the Eleventh Amendment issue before considering the specifics of the plaintiffs' case, including whether they had stated a claim. But if the outcome either way would result in a decision that could not by definition infringe on the state's sovereign immunity, we may look at the agreement issue first.

The Floyd plaintiffs' case hinges critically on the assumption that the MSA settled claims that originally belonged to them. They recognize that in the final analysis those claims would not cover amounts the State of Wisconsin spent in furnishing medical services to them, because the state would always be entitled to recover those payments out of any third party recovery before it had to distribute any money back to the plaintiffs. What concerns them is the possibility that the third party might pay more to the state than the state and federal government expended on their medical services. When that happens for an assigned claim, of course, 42 U.S.C. sec. 1396k(b) and 42 C.F.R. sec. 433.154(c) require the residual funds to go to the individual.

The state argues that the fact that its original suit against Tobacco did not include subrogated or assigned claims means that the monies it recovers under the settlement are not subject to this distribution scheme at all. We are dubious about that point, given the breadth of the language of MSA para. II(nn), which describes the "claims released." Nothing prevented the parties to the settlement from negotiating a broader release than might have been necessary under the lawsuits that began the case. Furthermore, this was a global settlement involving a great many states. (Indeed, we have an amicus brief before us filed by 34 states, plus the Commonwealth of the Northern Mariana Islands and the Commonwealth of Puerto Rico, lest we had been under any misapprehension about the scope of these proceedings.) Some of the states may have included assigned or subrogated claims in their initial litigation, even if Wisconsin did not. At this point the only relevant document is the MSA itself, and it is not hard for us to imagine that the definition of "released claims" set forth above should be construed to include claims that the state holds by virtue of an assignment from another party.

But what exactly was assigned in Wisconsin? If the only thing the individuals assigned was their right to recover the amounts paid by the Medicaid program--not their right to recover any excess-- then there is nothing left to distribute to them

to which they could have any claim. Two things persuade us that this is exactly what happened. The first is a recent decision of the Wisconsin Supreme Court construing the assignment rules that Wisconsin follows for its Medicaid program, Ellsworth v. Schelbrock, 611 N.W.2d 764 (Wis. 2000), and the second is the language of MSA para. II(pp) defining the "releasing parties" in a way that preserves the rights of individuals to continue trying to sue Tobacco.

In Ellsworth, the court confronted a rather ordinary tort case. Mark Schelbrock, while driving his car, struck the vehicle driven by Hope Ellsworth, and Ellsworth suffered serious injuries as a result. Ellsworth then sued Schelbrock and his insurance company; because Ellsworth had been the recipient of medical assistance payments from Dunn County, Wisconsin, the county intervened as a party plaintiff to assert a claim of subrogation. One of the important questions before the Wisconsin Supreme Court dealt with the way to value the medical services Ellsworth had received. She claimed that the proper valuation was the market value of those services, which amounted to $597,448.27, notwithstanding the fact that they had been rendered by medical providers who had agreed to cap their recovery at the amount authorized by Wisconsin's medical assistance program. That amount was significantly lower--$354,941--and Schelbrock argued that he should not have to pay any more than that as damages.

A majority of the Wisconsin Supreme Court sided with Ellsworth. After holding that the collateral source rule applies to cases in which the injured person is treated under the public assistance program and that the proper measure of the tortfeasor's liability was the market value of services received, not the actual price, the court turned to the questions of subrogation and assignment. With respect to subrogation, the court held that Dunn County was indeed subrogated to Ellsworth's claim, to the extent that it was entitled to recoup from the tortfeasor the amounts it expended for her medical services (i.e., the $354,941). With respect to the assignment, Schelbrock had tried to argue that Dunn County held all of Ellsworth's claim, and thus that it could not recover any more than it had spent (perhaps referring implicitly to ideas of unjust enrichment). The court disagreed, in the following passage:

Finally, Schelbrock contends that Ellsworth has assigned all rights for the collection of medical expenses to the state pursuant to Wis. Stat. sec. 49.45(19)(a)2 . . . and therefore cannot collect any damage award for medical expenses that is not

subrogated to the state. We disagree. Wisconsin
Stat. sec. 49.65 [now codified at sec. 49.89],
not sec. 49.45(19)(a)2, specifically addresses
assignment of actions and subrogation of rights
by a public assistance recipient who is injured
and has a tort claim against a third party.
Within the context of a tort action, the
assignment is to the extent that Medical
Assistance payments were made for injuries
arising as a result of the injury. . . .

   Read together, [sec. 49.89] and sec.
49.45(19)(a)2 assign to the state the amount of
assistance expended as a result of the injury by
the tortfeasor. The statute contemplates any
"remainder" being available for payment to the
public assistance beneficiary after the state
receives its subrogated amount. Therefore, we
find Schelbrock's argument on this point
unpersuasive.

611 N.W.2d at 770-71. (Justice Sykes, joined by
two other members of the court, dissented to this
part of the holding.)

   Several points are important for our purposes.
First, despite wording in sec. 49.45(19)(a)2 that
might make one think that public assistance
recipients cannot bring an independent action
against a tortfeasor because they have assigned
their claim to the state, that is plainly not the
way the Wisconsin Supreme Court construes the
statute. Ellsworth's entire case would have been
barred if that had been true, and it clearly was
not. Second, again despite the wording of sec.
49.45(19)(a)2, which speaks of the assignment of
"any rights to medical support or other payment
of medical expenses from any other person" and
thus might have meant all such rights, the
Wisconsin Supreme Court took a narrower approach
to the statute. Instead of viewing the assignment
as covering the full claim, including claims for
medical services that were not covered by Medical
Assistance, it held that the assignment
corresponds exactly to the amounts the state
pays. Someone like Ellsworth, therefore, can
either get a windfall (if she was ultimately able
to keep the $242,507.27 difference between the
amounts the providers agreed to accept for
treating her and the amount Dunn County received
in subrogation), or, if there is any legal way
providers can assert a right to reimbursement for
the balance after the fact (which seems unlikely,
but is a complex point on which we express no
opinion), the tort recovery might enable the
person either to cover expenses that were outside
the scope of Medical Assistance or to reimburse
others who could not collect more earlier.

   The MSA language concerning "releasing parties"

suggests that this possibility was not entirely foreign to the people who drafted the agreement. MSA para. II(pp) is careful to limit the parties releasing claims to the Settling States and their various subdivisions and constituent institutions. Individual persons under MSA para. II(pp)(2)(A) release claims only insofar as they are acting for the state and suing on general injuries, not insofar as they are seeking "solely . . . private or individual relief for separate and distinct injuries." Again, MSA para. II(pp)(2)(B) is careful to distinguish between recovery that an entity of the state might receive for health-care expenses, as opposed to the same kind of recovery that an individual might seek. We read this to indicate that the MSA itself recognized that the assignments the states received might not include all claims related to health-care expenses and that it did not purport to extinguish the claims of individual persons who were not part of the settlement process (a move that would have been problematic at best). Ellsworth shows that in Wisconsin at least some claims will fall into that category.

The Floyd plaintiffs recognize that they have no right to the monies actually expended by the state for the provision of medical services to recipients of assistance. The subrogation right of sec. 49.89(2) makes that clear, as does the allocation scheme of 42 C.F.R. sec. 433.154. Since those are the only claims for medical treatment that Wisconsin settled, or perhaps even could settle given the restrictive scope the Wisconsin Supreme Court has now given to the assignment provision of sec. 49.45(19)(a)2, it follows that there is nothing in the MSA to which the plaintiffs may assert a claim. It also means that it is possible that this settlement agreement resolved somewhat less than Tobacco had hoped, although as we just noted, that is not clear given the language of MSA para. II(pp). That, however, is not our concern; all parties to the MSA were represented by prominent counsel, and any questions of interpretation of that agreement beyond what we have addressed are for another day.

We add that the administrative problems that would be created by any other ruling would be nightmarish. As Wisconsin and the other states point out, the total sums of money to be paid under the MSA are not earmarked for different claims. Some of it is to go to educational programs; some of it to research; some to reimbursement of the state's expenses in treating sick people and in supporting families whose wage-earners are disabled from smoking; some is frankly punitive. The final amount to be paid, after 25 years have elapsed, is unknown and

unknowable at this point, because it depends partly on how successful the anti-smoking campaigns turn out to be.

For all these reasons, we AFFIRM the judgment of the district court dismissing this action.